[No. 57736-6. En Banc. November 25, 1992.]

NORMAN WASHBURN, ET AL, *Respondents*, v. BEATT EQUIPMENT COMPANY, *Appellant*.

250

*Reed McClure,* by *William R. Hickman* and *Heather Houston,* for appellant.

*Edwards, Sieh, Wiggins & Hathaway,* by *Charles K. Wiggins; Fury Bailey,* by *William S. Bailey,* for respondents.

*Douglas A. Hofmann, Mary H. Spillane,* and *Robert C. Manlowe* on behalf of Associated General Contractors, amicus curiae for appellant.

*Stephen P. Larson* on behalf of Washington Defense Trial Lawyers, amicus curiae for appellant.

*Bryan P. Harnetiaux* and *Gary N. Bloom* on behalf of Washington State Trial Lawyers Association, amicus curiae for respondents.

BRACHTENBACH, J. — This appeal by defendant is from a judgment rendered upon special jury verdicts. The plaintiffs are Norman Washburn and his wife Sharon. Mr. Washburn was extensively burned and permanently injured when a standby propane fuel system caught fire and exploded. The jury awarded plaintiff[1] $6 million and his wife $2 million.

Plaintiffs cross-appeal the calculation of the amount of judgment against defendant, Beatt Equipment Company, which was reduced to a total of $5,670,000. We affirm except to modify the amount of the judgment, for reasons explained hereafter.

We briefly summarize the defendant's contentions. (1) Defendant's principal argument on liability is that plaintiffs' action is barred by a statute of repose. The statute of repose does not protect a manufacturer. The jury was instructed on the definition of "manufacturer". *That instruction was proposed by defendant.* The jury, by special verdict, found as a matter of fact that defendant was a manufacturer, *as defined by defendant.* Further, by special verdict, the jury found that defendant's product was not reasonably safe, *as defined in an instruction to which no exception was taken.* (2) Defend-

---

[1]When we refer to plaintiff in the singular, it is in reference to Norman Washburn.

ant claims an abuse of discretion in admitting certain photographs. (3) Defendant attacks the size of the verdicts. (4) Defendant claims error in a pretrial procedural ruling.

On October 15, 1986, plaintiff Norman Washburn and a fellow Boeing employee, Scottie Holmes, were at a Boeing/Kent building to test a standby propane fuel system. The propane system had been in place since its construction and installation by defendant in 1969, but had never been put to regular use. Plaintiff turned on the propane and saw there was no pressure showing on the gauge. Before he could investigate, "everything just blew up." Verbatim Report of Proceedings (VRP) vol. 3, at 159.

The building caught fire. Automobiles in the adjacent parking lot caught fire and exploded. Fire was shooting out of the ground. There was a wall of fire. VRP vol. 3, at 88, 160. Plaintiff and Holmes were both on fire; Holmes was completely aflame. Plaintiff "had fire on his head, his hair, his back." VRP vol. 3, at 91. Plaintiff rolled on the ground, but Holmes ran in circles. Plaintiff ran to help Holmes but caught on fire again. Skin was falling off both of them. Plaintiff helped put out the fire on Holmes and yelled for someone to turn off the propane to prevent the storage tank from exploding. VRP vol. 3, at 160-63.

Holmes died 10 hours later. Plaintiff, with burns on 70 percent of his body, was hospitalized from October 15 to December 24. He underwent six surgeries during that confinement, and four additional surgeries over the next 16 months. His injuries will be described in the discussion of the damages award.

The defendant Beatt Equipment Company was known as Mid-Mountain Contractors when it contracted to construct the pipeline system. It specialized in pipeline excavation and construction in the 11 western states. It had experience in installing gas pipelines, having done about $150 million of work in Washington State alone. Defendant's president agreed that defendant held itself out as an expert in installing pipelines. VRP vol. 5, at 305. Defendant became involved in creation of the standby heating system when a subcontract

was awarded to it by Petrolane, which had a contract with Boeing to install a standby propane fuel system at its Kent facility. Defendant was to supply all the piping material, do various finishing processes, and bury the pipeline. Exhibit 26.

There was substantial evidence that defendant did not comply with contract specifications and did not meet industry standards. One expert testified, without objection, that these failures by defendant caused the explosion. VRP vol. 6, at 215. There was expert testimony that the pipe was significantly thinner than called for in the specifications. VRP vol. 6, at 196; vol. 7, at 323. The pipe was not properly prepared before it was welded, wrapped and coated. As a result corrosion was inevitable. VRP vol. 7, at 322, 337-38. The coating which is applied to the welded and wrapped joints is critical to protection against corrosion. The specifications called for a coal-tar enamel; defendant used cheaper, less durable and more permeable asphalt coating, and applied a thickness roughly a third less than specified. VRP vol. 5, at 273-83. The thinner coating would "definitely decrease the life of the coating." VRP vol. 5, at 282-83.

A coatings expert testified, without objection, that the improper coating material, applied at less thickness than specified, contributed to the corrosion which caused the explosion. VRP vol. 5, at 283.

The coating was damaged before the pipe was buried. VRP vol. 6, at 204. The backfill material did not meet specifications; consequently chunks of asphalt material damaged the coating. This was a very important defect. VRP vol. 6, at 201-02, 205. The experts testified that the installation was substandard, and that the variations from the specifications and industry standards were "[g]reatly significant." VRP vol. 6, at 199, 211. The experts testified, without objection, that these deficiencies were the proximate cause of the explosion.

With that background we turn to the heart of the question of liability. The only defense to liability asserted on appeal is the statute of repose. Defendant argues that it constructed an improvement upon real property within the

reach of RCW 4.16.300.[2] Under RCW 4.16.300 and .310,[3] a cause of action must accrue within 6 years of substantial completion of the improvement, and then a claimant must file suit within the applicable statute of limitations. *Del Guzzi Constr. Co. v. Global Northwest Ltd.*, 105 Wn.2d 878, 883, 719 P.2d 120 (1986). Defendant argues that plaintiffs' cause of action would have to have accrued within 6 years of completion of its work.

However, the statute of repose is subject to an exception, *i.e.*, it "shall not apply to claims or causes of action against manufacturers". RCW 4.16.300.

Because of this particular record, we have a very narrow issue concerning whether defendant was a "manufacturer" within the proviso in RCW 4.16.300. More particularly, if there was a jury question whether defendant was a manufacturer, affirmance is required.

First, however, we note plaintiffs' argument that the pipeline was not an "improvement upon real property" within

---

[2]"RCW 4.16.300 through 4.16.320 shall apply to all claims or causes of action of any kind against any person, arising from such person having constructed, altered or repaired any improvement upon real property, or having performed or furnished any design, planning, surveying, architectural or construction or engineering services, or supervision or observation of construction, or administration of construction contracts for any construction, alteration or repair of any improvement upon real property. This section is intended to benefit only those persons referenced herein and shall not apply to claims or causes of action against manufacturers." RCW 4.16.300.

[3]"All claims or causes of action as set forth in RCW 4.16.300 shall accrue, and the applicable statute of limitation shall begin to run only during the period within six years after substantial completion of construction, or during the period within six years after the termination of the services enumerated in RCW 4.16.300, whichever is later. The phrase 'substantial completion of construction' shall mean the state of completion reached when an improvement upon real property may be used or occupied for its intended use. Any cause of action which has not accrued within six years after such substantial completion of construction, or within six years after such termination of services, whichever is later, shall be barred: PROVIDED, That this limitation shall not be asserted as a defense by any owner, tenant or other person in possession and control of the improvement at the time such cause of action accrues. The limitations prescribed in this section apply to all claims or causes of action as set forth in RCW 4.16.300 brought in the name or for the benefit of the state which are made or commenced after June 11, 1986." RCW 4.16.310.

the meaning of RCW 4.16.300, contrary to the trial court's determination. If the pipeline was not an improvement to real property, RCW 4.16.300 simply does not apply and the builder's statute of repose, RCW 4.16.310, does not bar the suit. We base our decision in this case upon other grounds, however, and assume, without deciding, that the pipeline was an improvement upon real property, as the trial court held.

Second, we dispose of the alternative product seller theory of liability. Plaintiffs were allowed to pursue their claim that defendant was a product seller to whom the statute of repose did not apply. It is true, as plaintiffs claim, that the jury necessarily found defendant to be a product seller under the instructions given. Under jury instruction 17, the jury had to find that defendant was a product seller in order to determine that defendant was a manufacturer. However, to prevail on their theory that defendant was a product seller whose negligence caused plaintiffs' injuries, plaintiffs had to establish defendant's negligence. *See* RCW 7.72.040(1)(a). The special verdict forms directed the jury to first determine whether defendant was a manufacturer and then, if the jury found that defendant was a manufacturer, to proceed to the special verdict form for determining liability on that theory. The jury therefore never answered questions about whether defendant was negligent as a product seller. We do not address the product seller theory, as we uphold the verdict and judgment on manufacturer liability grounds.

To decide whether this case should have gone to the jury on the issue whether defendant was a manufacturer, and therefore not protected by the statute of repose, we first look to the definition in the jury instructions. The relevant instruction is the trial court's instruction 17, given *exactly as submitted by defendant* and set out in the footnote.[4] We then examine the facts to ascertain whether defendant's activities fall within that definition.

---

[4]"A product seller is any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use and consumption. The

■ *We emphasize that the definition of "manufacturer" is contained in only one instruction. That instruction was submitted by the defendant.* At the instruction conference, defense counsel, in referring to defendant's proposed definition of manufacturer, stated: "I think that this is a correct statement of the law . . .". VRP vol. 8, at 664. Defense counsel was careful to note his exception to submitting the case to the jury on the theory that it was a manufacturer, VRP vol. 8, at 664-65, but the *definition* of manufacturer is binding on defendant as its proposed instruction. There was *no exception* to the instruction stating the duty of a manufacturer. Instruction 16; Clerk's Papers, at 708.

The jury returned special verdict forms. The jury was asked: (1) "Was the defendant a manufacturer of the pipe in question?" Answer: "Yes." Clerk's Papers, at 724. (2) "Did the defendant supply a product which was not reasonably safe in construction at the time the product left defendant's control?" Answer: "Yes." Clerk's Papers, at 726. The "not reasonably safe" standard was established by the definition of a manufacturer's duty to which no exception was taken.

Before analyzing the facts relating to defendant's activities, we reject a major portion of defendant's arguments. Defendant asserts "that the court erred by accepting *plaintiffs'* definition of manufacturer." (Italics ours.) Brief of Appellant, at 30. As shown above, and there is no question about it, the court accepted *defendant's* definition.

The definition of manufacturer in instruction 17 is identical to the definition in the product liability act, RCW 7.72-.010(2).[5] Defendant asserts that use of that definition "was

---

term includes a manufacturer, wholesaler, distributor or retailer of the relevant product.

"Manufacturer includes a product seller who designs, produces, makes, fabricates, constructs or remanufactures the relevant product or component part of a product before its sale to a user or consumer.

"A product seller who performs minor assembly of a product in accordance with manufacturer's instructions shall not be deemed a manufacturer." Instruction 17; Clerk's Papers, at 709.

[5]"Manufacturer. 'Manufacturer' includes a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or

totally inappropriate in this case." Brief of Appellant, at 40. We repeat that the trial court accepted *defendant's* definition which defendant stated was a correct statement of the law.

Defendant argues extensively about legislative history, and legislative intent, all to the end that the instruction defining manufacturer was in error. It argues for narrow construction of the proviso excepting manufacturers from the statute of repose. Defendant contends that because the word "manufacturer" is not defined in RCW 4.16.300 it must be given its plain and ordinary meaning. Brief of Appellant, at 42; Reply Brief of Appellant, at 20-24.

All of these arguments are irrelevant. *This case went to the jury with the definition of manufacturer exactly as proposed by defendant.*

Therefore, the only issue is whether, as a matter of law, it was error to submit the case to the jury under the definition furnished by defendant. Because of this state of the record we do not decide whether the definition of manufacturer should be that contained in the product liability act, and we do not ascertain legislative intent in excepting manufacturers from the statute of repose. All that is decided is whether defendant's activities were within the definition of manufacturer as proposed by defendant as a correct statement of the law. As noted above, the jury's special verdict found defendant to be a manufacturer as that term was defined for it in defendant's instruction.

It is crucial in this case that defendant's theory below was that as a "contractor/installer" the statute of repose barred plaintiffs' action as a matter of law. However, in pretrial and posttrial memoranda and briefs in support of motions for partial summary judgment, a directed verdict, judgment n.o.v. and a new trial, the defense recognized that if there were disputed factual questions on the issue whether defendant was a "manufacturer" and whether plaintiffs' cause of

component part of a product before its sale to a user or consumer. . . ." RCW 7.72-.010(2).

action arose from manufacturing activity, then there were material issues of fact requiring resolution before applicability of the statute of repose could be determined.

For example, the defense agreed that an "activities" analysis is appropriate, and that the activities of manufacturing and sale are not protected by the statute of repose. Clerk's Papers, at 392; *see Pfeifer v. Bellingham*, 112 Wn.2d 562, 772 P.2d 1018 (1989). In a memorandum in support of partial summary judgment motion asking the trial court to dismiss all claims based on activities as a contractor/installer, the defense agreed with plaintiffs that "[f]or those alleged activities not covered by the statute, *such as the* alleged *'manufacture' of the pipe* . . . the claims are *not covered by the statute of repose*." (Italics ours.) Clerk's Papers, at 552. The defense acknowledged that "questions of fact may remain as to whether or not Beatt Equipment was a seller or manufacturer of the allegedly defective pipe", but maintained that there was no question of fact that constructing/installing activities were shielded by the statute of repose. Clerk's Papers, at 378.

When the trial court determined that factual questions remained about whether defendant was a manufacturer or a product seller, *defendant* proposed the only jury instruction defining manufacturer.

The operative words in instruction 17 are that a manufacturer is one who (1) produces, (2) makes, (3) fabricates, (4) constructs, or (5) remanufactures the relevant product or component part of the product.

Examination of these operative words must be made in the context of defendant's theories why these words do not permit it to be a manufacturer. First, defendant advances the implausible idea that the sole purpose of the proviso was to exclude asbestos manufacturers. Brief of Appellant, at 36. No definition of manufacturer lends substance to that contention.

Next, defendant argues that manufacturer includes "only those manufacturers of standardized, pre-manufactured prod-

ucts which are later incorporated into an improvement to real property." Brief of Appellant, at 42. Superficially there is some appeal to defendant's contention — one tends to think of a manufacturer as the operator of a factory, mass producing products. However, the definition supplied by defendant completely destroys this superficial appeal. Defendant's argument goes to the nature of production, *i.e.*, standardized products, and to the quantity of production, *i.e.*, mass produced product. No such limitations are in the definition furnished by defendant's instructions. To make, produce, fabricate, or construct a single product or even a single component part of a single product can render defendant a manufacturer under defendant's own definition.

Again, the words are: (1) produces, (2) makes, (3) fabricates, (4) constructs, or (5) remanufactures. Dictionary definitions prove these words to encompass very broad activities.

"Produce" includes "to give being, form, or shape to" and *"to make economically valuable"*. (Italics ours.) *Webster's Third New International Dictionary* 1810 (1981). To "make" includes "to bring (a material thing) into being by forming, shaping, or *altering material"*; *"to lay out and construct"*, and *"to put together from components or ingredients"*. (Italics ours.) *Webster's*, at 1363. To "fabricate" means *"to form into a whole by uniting parts"* and *"to build up into a whole by uniting interchangeable standardized parts"*. (Italics ours.) *Webster's*, at 811. To "construct" includes "to form, make, or create by combining parts or elements". *Webster's*, at 489.

Having in mind these very broad, all encompassing definitions, we examine the evidence of defendant's activities.

The prime contract for which defendant was a subcontractor was not for individual parts, but for a *system*. Exhibit 4. Defendant was paid a lump sum. Defendant was not merely selling *pieces* of pipe, it was to make, fabricate and construct a pipeline *system*. Exhibit 26.

The 20-foot lengths of pipe could not be used in the condition they were produced by the original manufacturer.

Defendant contends it merely welded and field wrapped the welds. Brief of Appellant, at 39. In fact, much more had to be done for the pipe to be usable and to become an integral part of the heat system. The last 6 inches on each length of pipe was bare. It could not be used in that condition. The balance of the pipe was wrapped by the original manufacturer. Proper wrapping by defendant was a critical part of finishing the pipe. Proper wrapping, to meet contract specifications and industry standards, was crucial to prevent corrosion.

For the pipe to be usable defendant had to complete the manufacturing process. First, part of the factory coating had to be removed, *i.e.*, 6 inches of the wrapping were removed and then the edges "feathered". The exposed metal, now a foot on each end, had to be cleaned thoroughly to remove rust, scale, welding slag, rod-flux, oil, grease or other foreign material.

The purpose of such meticulous cleaning was to get a proper surface for a good bond with the primer. That was not done properly. VRP vol. 7, at 333-43, 346. The joints were then welded. VRP vol. 5, at 319.

Next a coal-tar primer was to be applied to the bare pipe and the mill wrapped area of the pipe. After drying the material is "flash flamed". Then the bare pipe and the exposed mill wrapping area is spirally wrapped. Again it is "flash flamed". Coal-tar enamel is applied. Then a specified Kraft paper is wrapped over the joined pieces. Exhibits 4, 24, 30.

The most important layer is the coal-tar primer. VRP vol. 7, at 325. The coal-tar enamel was to contain *no asphalt*. Exhibit 24. Defendant used a cheaper enamel which contained asphalt. The specifications called for a certain thickness of coatings. Defendant applied roughly one-third less than specified. VRP vol. 5, at 273-83.

The manufacturing of the pipeline *system* should be inspected, according to industry standards, by an electrical device to detect coating defects. Exhibit 24, at 18, 20. From

defects in coating later discovered it is a fair inference that this step in the process was not done. An integral part of the construction of the pipeline *system* is avoiding damage to the protective coating in placing the system in place. Exhibit 24, at 20. There was evidence of abrasions to the coating. VRP vol. 6, at 203-04.

■ The determinative issue is whether there was evidence or reasonable inferences arising therefrom to sustain a verdict in plaintiff's favor. The evidence must be considered in a light most favorable to plaintiff. *Shelby v. Keck*, 85 Wn.2d 911, 913, 541 P.2d 365 (1975).

Applying the definitions of the words to defendant's activities leads to the firm conclusion that it was a jury question whether defendant was a manufacturer. Defendant took an unfinished and unusable product, and by use of its labor and materials made it economically valuable. That is one of the definitions of "produce". Defendant altered the unfinished material and put together components to make a finished product. That is one of the definitions of "make". Defendant formed a whole by uniting parts. That is a definition of "fabricate". Defendant put together constituent parts, after completing their manufacture, so as to make or create something, *i.e.*, a usable pipeline system. That is a definition of "construct".

We hold that there was a jury question whether defendant was a manufacturer *under the definition contained in defendant's own instruction.*

However, we address other contentions by defendant. Defendant argues that the pipe sections were a product, but the constructed pipeline was not. Further, defendant contends the pipe was not a "product" within the definition of the product liability act. RCW 7.72.010(3).

■ Defendant proposed no instruction defining product even though the word product was used in five separate instructions. Instruction 2; Clerk's Papers (CP), at 694; instruction 5; CP, at 697; instruction 16; CP, at 708; instruction 17; CP, at 709; instruction 18; CP, at 710. Defendant took no

exception about the meaning of product or the lack of a defini-
tion thereof. VRP vol. 8, at 661-77. The jury in its special
verdict form found defendant supplied a product which was
not reasonably safe. Clerk's Papers, at 726. Whether that
product was the pipe or completed pipeline is not material
under the instructions to which no exception was taken. It is
too late to suggest on appeal a definition when no instruction
was proposed on that subject.

Defendant argues that if it is a manufacturer then every
subcontractor, be it a carpenter, electrician or gas pipeline
layer, will be a manufacturer. Brief of Appellant, at 41.
There are several reasons why defendant's "parade of hor-
ribles" is not accurate. First, it is the definition provided by
defendant which applied to its activities *in this case*. Second,
to be a manufacturer under the instructions, *in this case*,
defendant had to be a product seller, which the jury found it
to be. A subcontractor electrician or carpenter usually will
not be a product seller. Third, and most importantly, the
electrician or carpenter generally will not be completing the
manufacturing process. The electrician merely uses two or
more already completed and manufactured products and
joins them together. For example, the electrician starts with
the service panel which is a complete and fully manufac-
tured product in and of itself. Electrical wire is a complete
and fully manufactured product in and of itself, as is a light
fixture. The electrician does nothing to complete the manu-
facture of any of these components. The carpenter does not
complete the manufacture of the lumber, but makes use of it
in its already manufactured form.

■■ Using the language of defendant's instruction the
electrician does not produce, make, fabricate or construct
any of the parts. To the extent that the electrician or the
carpenter assembled the finished products, there would be
no liability under the instruction, in this case, where the
jury was instructed that: "A product seller who performs
minor assembly of a product in accordance with manufac-
turer's instructions shall not be deemed a manufacturer."

Instruction 17; Clerk's Papers, at 709. The jury had the opportunity to agree with defendant's contention that it was merely assembling pieces of pipe. Defendant argued that point to the jury, urging that putting someone else's products together did not make it a manufacturer. VRP vol. 8, at 753. The jury is presumed to have followed the court's instructions. *Bordynoski v. Bergner*, 97 Wn.2d 335, 342, 644 P.2d 1173 (1982). The jury, by its special verdict, did not accept defendant's argument. It is not our function to substitute our evaluation of the evidence.

Next, defendant complains that the trial court erred by failing to give its proposed instruction 4. This instruction would have defined "installer" and would have informed the jury that any claim based upon defendant's activities as an installer was barred by a statute of limitations (the statute of repose). The trial court correctly concluded that the jury should not be instructed about the statute of repose, as the question whether it bars suit is a legal matter for the court although a trier of fact may have to decide factual questions. The trial court correctly rejected the improper instruction.

Moreover, under the instructions given defendant was free to argue its theory that its activities in installing the pipeline were not manufacturing activities subjecting defendant to liability. *See Phillips v. Seattle*, 111 Wn.2d 903, 911, 766 P.2d 1099 (1989) (instructions are sufficient which permit a party to argue its theory of the case) (citing *State v. Ng*, 110 Wn.2d 32, 41, 750 P.2d 632 (1988)). Instruction 5 told the jury that plaintiffs had to prove that defendant was either a manufacturer which supplied a product which was not reasonably safe in construction at the time the product left defendant's control or a product seller who was negligent. Instruction 16 informed the jury that a manufacturer has a duty to supply products which are reasonably safe. The instruction described what constitutes a product which is not reasonably safe in construction, and listed factors to consider in making the determination. Instruction 17 defined manufacturer. Instruction 18 instructed the jury in terms of the

products liability act statute of repose, *i.e.*, the "useful safe life" of a product, including the presumptive safe life of 12 years. From these instructions defendant could argue that any fault in "installation" was not fault in manufacturing. It would then be the jury's function to apply the instructions to the evidence and decide defendant's theories of nonliability.

Defendant complains that the trial court erred by allowing evidence to be introduced respecting defendant's installation and construction activities. The trial court was concerned about this question, but could find no realistic way to segregate the evidence. The court reasoned, moreover, that defendant was free to argue its theory that it was not a manufacturer.

■ We conclude the trial court did not err in allowing the evidence to be presented at trial. Generally, admissibility of evidence is in the trial court's discretion and its rulings on admissibility of evidence are reviewed under the abuse of discretion standard. *Brouillet v. Cowles Pub'g Co.*, 114 Wn.2d 788, 801, 791 P.2d 526 (1990).

We agree with the trial court's ruling that segregating "installer" activities and "construction" activities would have been exceedingly difficult in this case, and more confusing to the jury than helpful. For example, plaintiffs introduced evidence to the effect that defendant used the wrong kind of fill in burying the pipe, that sharp chunks in the fill damaged the pipe's coating, and that corrosion was thereby accelerated. The project was not complete, however, until the pipeline was buried, and until then it was still within defendant's control. The finished item turned over to Boeing was the buried pipeline, the entire pipeline system. There is thus a close question as to when manufacturing was completed.

Moreover, the jury would have been given a fragmented account of the facts in this case had the trial court attempted to segregate "installation" and "construction" activities from "manufacturing" activities. Some of defendant's conduct could be said to constitute both activities, and clearly evi-

dence which the jury could view as manufacturing activity should not have been excluded.

As we have noted, defendant was free to argue its theory that its installing activity did not subject it to liability, *i.e.*, that it was not "manufacturing". The instructions permitted the argument, as the trial court noted.

We conclude that the trial court did not abuse its discretion in ruling on admissibility of evidence of "installing" and "constructing" the pipeline.

Finally, we note that defendant assigns error to the giving of instructions 2, 5, 17, and 18 (which instructed the jury on liability of a product seller or a product manufacturer), and to the verdict form which submitted theories of seller and manufacturer liability to the jury.

However, defendant does not complain that these instructions about products liability are incorrect statements of the law. Instead, defendant argues that the case should not go to the jury under a products liability theory. We have concluded, however, that under the circumstances of this case plaintiffs' cause of action was not barred by the statute of repose.

## AMOUNT OF VERDICT

We now turn to defendant's challenge to the amount of damages awarded plaintiffs.

Defendant first argues that the award is so out of proportion to the husband's injuries that it should shock the conscience of the court. Defendant does not state the principles involved in examining an award on this ground. Defendant cites no Washington case except a Court of Appeals case, *Winfrey v. Rocket Research Co.*, 58 Wn. App. 722, 794 P.2d 1300, *review denied*, 115 Wn.2d 1030 (1990). That case did not involve review of the damage award. Only part of one sentence even describes the injuries. The case is not relevant. Defendant cites three federal circuit court cases and two federal trial court decisions. Defendant fails to note that the standard of review in federal courts is different from our standard. This principle is discussed in *Felder v.*

*United States*, 543 F.2d 657, 664 (9th Cir. 1976), where the court applied a clearly erroneous standard of review rather than the standard of the state whose law was otherwise applied. If federal cases were relevant we would note *Dabney v. Montgomery Ward & Co.*, 761 F.2d 494, 501 (8th Cir.), *cert. denied*, 474 U.S. 904, 88 L. Ed. 2d 232, 106 S. Ct. 233 (1985) where the court affirmed a $2 million award which was twice the verdict in the first trial. The court noted " 'we must expect substantial disparities among juries as to what constitutes adequate compensation for certain types of pain and suffering.' " *Dabney*, at 501 (quoting *Vanskike v. Union Pac. R.R.*, 725 F.2d 1146, 1150 (8th Cir. 1984)).

■ Defendant then asks us to compare this award to those made in 10 other cases. Nine of the cases are unreported trial court verdicts, seven in superior courts and two in federal district court. We reject defendant's invitation. First, it is not proper to cite unreported trial court verdicts; they are without relevance in the appellate process. Even if we were inclined to make such comparison, there is no basis for comparison. There is no record of the proceedings in those cases. There are no briefs. All that defendant provides is a few summary lines describing injuries, apparently from an unofficial publication, Jury Verdicts Northwest. Brief of Appellant, at 63. A valid comparison is impossible.

■ Second, we reject defendant's underlying premises in urging such comparison. Defendant argues that these damages are grossly excessive because since 1987 "general damage awards in excess of $1 million have almost exclusively been awarded to infants or young adults who suffer catastrophic injuries so terrible that their ability to function in this world will be severely and permanently compromised." (Footnote omitted.) Brief of Appellant, at 63. This theory is inimical to the foundation of particularized justice.

Defendant would consign damages for personal injuries to the cold world of accounting balance sheets. In effect, defendant argues that a verdict can never exceed what has historically been awarded for what defendant conceives to be comparable injuries — so much for a particular injury

and no more, ever. That notion is repugnant to a fundamental principle so well stated by Justice Hale in *James v. Robeck*, 79 Wn.2d 864, 869, 490 P.2d 878 (1971).

> To the jury is consigned under the constitution the ultimate power to weigh the evidence and determine the facts — and the amount of damages in a particular case is an ultimate fact. This court has, we think, consistently followed this principle.

Defendant cites *no authority* for the validity of a comparison of verdicts as the appellate standard to evaluate a claim of excessiveness. However, there is a considerable body of law which rejects such a comparison. We find it persuasive.

> Finally, [defendant] spends considerable time arguing that the award is excessive because it is large, or, as [defendant] puts it, "precedent shattering." . . . [T]he [law] . . . reject[s] this argument.
> "The vast variety of and disparity between awards in other cases demonstrates that injuries can seldom be measured on the same scale. . . . For a reviewing court to upset a jury's factual determination [of damages] on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding. [Citations.]" (*Bertero v. National General Corp., supra*, 13 Cal.3d [43] at p. 65, fn. 12 [529 P.2d 608, 118 Cal. Rptr. 184, 65 A.L.R.3d 878 (1974)]; *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 654-655 [151 Cal.Rptr. 399].)

*Fortman v. Hemco, Inc.*, 211 Cal. App. 3d 241, 261, 259 Cal. Rptr. 311 (1989); *see also Birgel v. Heintz*, 163 Conn. 23, 34, 301 A.2d 249 (1972).

Further, "[i]n considering whether a verdict is excessive, a comparison with previous verdicts is not justified because of the variations in facts and changes in the economy." *Moteberg v. Johnson*, 297 Minn. 28, 34, 210 N.W.2d 27 (1973).

> Both claims — excessiveness and inadequacy — have been presented by comparing awards in other cases. Such comparisons are not a proper basis for determining either excessiveness or inadequacy of damages. The comparisons are improper because the propriety of the amount of the damages awarded must be determined from the evidence in the case under consideration.

*Schrib v. Seidenberg*, 80 N.M. 573, 577, 458 P.2d 825 (1969).

Even in the few states where comparison of verdicts is permitted, defendant's comparisons would be inadequate. For example, in *Thomas v. State Farm Ins. Co.*, 499 So. 2d 562, 564 (La. Ct. App. 1986), *certs. denied*, 501 So. 2d 213, 501 So. 2d 215 (1987), the court pointed out that the award must be greatly disproportionate to the *mass* of past awards, *not selected* past awards. If an appellate court uses past awards to judge excessiveness, it must do the same to evaluate inadequacy. *See, e.g., Landaiche v. Lou-Con,* 461 So. 2d 1107, 1113 (La. Ct. App. 1984) (where the court, using a comparison method, increased an award by 70 percent, from $500,000 to $850,000).

We conclude that it is improper to assess the amount of a verdict based upon comparisons with verdicts in other cases.

■■■■ We now summarize the principles which govern such review by an appellate court of a verdict claimed to be excessive. We are guided by *Bingaman v. Grays Harbor Comm'ty Hosp.*, 103 Wn.2d 831, 699 P.2d 1230 (1985), where Justice Andersen, writing for a unanimous court, made an extensive review of the law, and accurately stated the controlling principles. Because *Bingaman* is comprehensive, not only in its statement of principles, but in supporting its conclusions by sound rationale, we quote at length.

> The determination of the amount of damages, particularly in actions of this nature, is primarily and peculiarly within the province of the jury, under proper instructions, and the courts should be and are reluctant to interfere with the conclusion of a jury when fairly made.
>
> . . . Because of the favored position of the trial court, it is accorded room for the exercise of its sound discretion in such situations. The trial court sees and hears the witnesses, jurors, parties, counsel and bystanders; it can evaluate at first hand such things as candor, sincerity, demeanor, intelligence and any surrounding incidents. The appellate court, on the other hand, is tied to the written record and partly for that reason rarely exercises this power.
>
> An appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.

. . . .

Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity as to make it unmistakable. . . .

The issue thus becomes whether the size of the award for pain and suffering in and of itself "shocks the conscience of the court." Stated otherwise, were the damages flagrantly outrageous and extravagant?

(Footnotes omitted.) *Bingaman*, at 835-37.

■ Although defendant maintains that the verdict should shock the conscience of this court, as noted defendant does not state the relevant principles. We start with the established premise that the determination of damages by the jury is a constitutional function of the jury. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 645, 771 P.2d 711, 780 P.2d 260 (1989). "To the jury is consigned under the constitution the ultimate power to weigh the evidence and determine the facts — and the amount of damages in a particular case is an ultimate fact." *James v. Robeck*, 79 Wn.2d 864, 869, 490 P.2d 878 (1971).

Further, "[t]he jury's role in determining noneconomic damages is perhaps even more essential." *Sofie v. Fibreboard Corp.*, *supra* at 646. "The determination of the amount of damages, *particularly in actions of this nature* [pain and suffering], is primarily and peculiarly within the province of the jury . . . and the *courts should be and are reluctant to interfere* with the conclusion of a jury when fairly made." (Footnote omitted. Italics ours.) *Bingaman v. Grays Harbor Comm'ty Hosp.*, *supra* at 835.

■ Given the foregoing constitutional principle and case precedent, appellate review is most narrow and restrained — the appellate court "rarely exercises this power." *Bingaman*, at 835.

Does the size of the verdict shock the conscience of the court? "Stated otherwise, were the damages flagrantly outrageous and extravagant?" *Bingaman*, at 837.

Defendant's only *factual* challenge to the award is 10 lines describing what plaintiff *can* do, all without citation to

the record. Here is defendant's description of plaintiff's injuries:

> Norman Washburn has returned to full-time work. He is not a quadriplegic. He is not a paraplegic. He is fully ambulatory. He requires no artificial devises [*sic*] to function. He has full mental capabilities. He is able to speak to and listen to other beings. He can feed and clothe himself. He has all five senses intact. He is able to live and interact with his family with only minor limitations. He was 53 [*sic*] at the time of the accident. He has a normal life expectancy.

Brief of Appellant, at 60-61.

█ In contrast, plaintiff sets out in detail the injuries suffered by plaintiff. Brief of Respondent, at 5-11. Defendant makes no reply thereto; defendant thereby concedes the accuracy of the description of the nature, extent, and permanency of the injuries and their support by substantial evidence.

█ As we turn to the evidence, we acknowledge, as does *Bingaman*, at 835, that an appellate court, "tied to the written record", cannot share the experiences of the jury or the trial court. Therefore, it is relevant and persuasive to consider the trial court's observations and reasoning in finding the verdict not excessive:

> In regard to the matter of whether the verdict was excessive or not, as the Court has indicated, there were many dynamics at play here that would lead the jury to come to the verdict it did. It's not the Court's role to secondguess counsel on strategic decisions made, but to point out that the verdict is not the product of any one particular factor in a trial but is the end result of a combination of things involving an advocacy situation, involving a case that was a very, very strong case calling out for damages. And Mr. Washburn's testimony and Mrs. Washburn's testimony of the ordeal they went through was very compelling but not in a way that the Court felt led to an excessive or overly emotional award from the jury.
>
> The jury obviously responded to the Washburns' situation but this Court can't say it shocks its conscience [that] they responded in the manner they did. The Court's job is not to say would the Court have done the same thing or is it even in the Court's high end of the range of what the Court would do, but the Court's job is to say does this verdict indicate that something untoward was going on, some emotion was at play

that was driving the result rather than the evidence, and the Court can't say that was the case.

Posttrial Motions vol. 10, at 32-33.

Also, deference and weight are given to the evaluation of the trial court's exercise of discretion in denying a new trial on a claim of excessiveness. *Bingaman*, at 835; *Sherman v. Seattle*, 57 Wn.2d 233, 247, 356 P.2d 316 (1960). The verdict is strengthened by denial of a new trial by the trial court. *Seaboard Coast Line R.R. v. Gillis*, 294 Ala. 726, 733, 321 So. 2d 202 (1975). The trial court here denied defendant's motion for a new trial.

We now describe plaintiff's injuries and then assess defendant's arguments. Explosion of the propane system resulted in a wall of fire. Plaintiff was literally on fire with his skin falling off. His co-worker, Holmes, whom he tried to help, had his hair burned off; "flames were shooting out from his whole body". VRP vol. 3, at 89, 160. Holmes' skin was yellow, peeling down, just falling off.

Seventy percent of plaintiff's body was burned; fifty to fifty-five percent of his body had third degree burns where the entire epidermis and dermis are completely destroyed and the skin has no ability to regenerate. Plaintiff was burned on his scalp, face, neck, chest, back, buttocks, thighs, front and back, both hands (top and bottom) and areas of both arms. Plaintiff's condition was critical and he had a 50/50 chance of survival. The emergency medics inserted a tube into his lungs so he could breathe.

Plaintiff was hospitalized in the Intensive Care Burn Center at Harborview Medical Center for 6 weeks; he remained in the hospital another month, out of intensive care. During his initial hospital stay plaintiff had six separate surgeries. Four additional surgeries occurred in the next 16 months. The surgeries are summarized as follows:

10/20/86 Surgery — removal of dead skin; grafting of buttocks, back, thighs, and right ankle.

10/21/86 Surgery — removal of dead skin; grafting of both legs and thighs.

10/24/86 Surgery — removal of dead skin; grafting of both hands and forearms, left upper arm and left abdo-

men. Donor sites — right upper arm and lower abdomen.

11/04/86 Surgery — removal of dead skin; grafting from chest donor site to artificial skin on right lower extremity.

11/14/86 Surgery — removal of artificial skin; grafting of right wrist and left flank from chest donor site.

11/26/86 Surgery — incisions to permit eye lid movement. Grafting to open scalp wound. Donor site — left anterior chest.

02/10/87 Surgery — readmit to Harborview. Web spaces of hands incised and released. Grafting to both hands.

07/07/87 Surgery — readmit to Harbor[view]. Release of contractures in grafts to left hand.

10/20/87 Surgery — readmit to Harborview. Burn reconstruction on right hand, five grafts; reconstruction of lower eyelids.

04/27/88 Surgery — readmit to Harborview. Incision and grafting of both hands.

Brief of Respondents/Cross Appellants, at 8-9; exhibits 15, 37, 38.

Various attending medical personnel described plaintiff's hospital treatment. Plaintiff required constant attention; he was able to do almost nothing for himself. Intensive care included treatment in the "tank room" where dressings are removed, the patient is sprayed and scraped to cleanse the wounds, dead or infected tissue is trimmed away, and new dressings applied — a 2- or 3-hour process twice daily. VRP vol. 6, at 64-65; vol. 4, at 234. One nurse stated that most people find it is the worst kind of pain they ever have in their life.

Typically such burn victims develop ICU (Intensive Care Unit) psychosis where they become disoriented and confused. Plaintiff became incoherent. VRP vol. 6, at 68.

Initially plaintiff was hooked to a ventilator to breathe, a tube was placed in his bladder, IV hookups and a feeding tube were inserted. Burns and scars on his eyelids prevented his eyes from closing. His hands were deeply burned and grafted extensively. In fact, one doctor said: "We grafted most of his body over about five different operations during the two months that he was in the hospital." VRP vol. 6, at 110-11. The doctor described the pain as "the worst

pain they can possibly imagine ever having . . . it's horrible pain . . . a dreadful, horrible experience . . .." VRP vol. 6, at 112-13. In describing the ICU psychosis, one doctor said "he went out to lunch [the psychosis] the fourth or fifth day [October 19 or 20] and didn't come back until he went downstairs, out of the ICU [November 25]". VRP vol. 6, at 113-14.

The extent of the burn damage was described by a doctor who stated that "actually his whole body is involved because what wasn't involved with the burn is involved as a donor site, so essentially a hundred percent of his body was in some way involved in the care of the burn . . .". VRP vol. 6, at 124-25.

When plaintiff regained consciousness at some point and saw his family and relatives he thought "I must be going to die." VRP vol. 4, at 232. Later he repeatedly asked to be awakened because "[i]f they wouldn't wake me up — I was kind of afraid to die." VRP vol. 4, at 236. This type of fear is mentioned in *Bingaman* as an element of damages the jury was entitled to consider. *Bingaman v. Grays Harbor Comm'ty Hosp.*, 103 Wn.2d 831, 837, 699 P.2d 1230 (1985).

After the initial 2-month hospitalization, plaintiff began physical and occupational therapy. One therapist said that the pain involved in this type therapy would be "[o]n a scale of one to ten, ten plus." VRP vol. 4, at 227. The therapist testified that plaintiff's hands were some of the worst she had seen, in part because of having been burned on both sides. Some areas of his hands had not yet healed. Lots of gauze was wrapped "all over his body." VRP vol. 4, at 191-94. He could not dress himself, toilet himself, bathe himself, care for his wounds or drive. He was able to feed himself in only a fairly primitive manner, having a very difficult time holding a utensil. VRP vol. 4, at 194-95.

Initial therapy focused entirely on the range of motion and function of his hands, with the therapist's maximum strength used in pushing on each joint to stretch the skin and joint structures — an hour for each hand. The ordeal was such that therapists alternated because "it was very

difficult to inflict pain on someone 5 days in a row . . . It is extremely painful. . . . At times, the skin would tear in the process because there wasn't enough skin." VRP vol. 4, at 197.

Therapy required wearing a splint during the night with the hands wrapped and the knuckles bent at 90 degrees. Because his fingers would not come apart and his thumb was rotated, a device had to be hooked over his fingers to spread the fingers apart. It was extremely painful as it involved maximum prying open of his fingers. VRP vol. 4, at 199-201. There were multiple problems with ridge scarring, pulling the little finger down and the wrist down. This required splinting. VRP vol. 4, at 202.

Special devices were employed to increase the flexion or fisting of the hand in hot paraffin and wrapping to obtain fisting — "one of the more painful devices or methods". VRP vol. 4, at 204-05. Gloves had to be worn 24 hours a day to help keep scarring ridges from forming on his hands. Plaintiff had neither the strength nor the dexterity to put on those gloves. VRP vol. 4, at 205.

Therapy also involved treatment of a foot drop; the toe would not come up when plaintiff was walking so plaintiff had to lift his leg very high or he would fall down. He had to wear a device to keep his ankle from bending. The device would "dig into" his leg because of edema.

The therapist also described the psychological damage. She described self-esteem as the most obvious: "how do you feel first about yourself or your body image and then how does that change because your physical appearance changes . . . [i]t is a permanent change . . .. [There is] a psychological impact [of being near death]. There is also a fear component of what your life is going to be like. . . . [i]n daily life of the family . . . nothing is routine anymore." VRP vol. 4, at 208-09.

Therapy also involved painful stretching of plaintiff's legs and trunk. VRP vol. 4, at 203.

Therapy extended from December 1986 to January 1988, 5 days a week, at least 2 hours each day, for a total of 182

sessions. In addition, plaintiff had to perform various exercises at home, 7 days a week, about 3 hours a day.

Long-term, and permanent effects of plaintiff's injuries were analyzed and described by attending physicians, occupational and physical therapists, a clinical psychologist specializing in rehabilitation, a care planning registered nurse, plaintiff, plaintiff's wife and their son.

As to permanency, the director of the Burn Center at Harborview Medical Center, one of the attending physicians, described it succinctly: "Being burned is forever . . .". VRP vol. 6, at 117.

Plaintiff's burns were so deep that not only were all layers of the skin destroyed, but fat cells were destroyed; they do not regenerate so the grafted skin is without a "cushion". Because of this he has little sensation in many areas so he is unable to use the feeling sensations of normal skin. Thus he "bumps" into objects. Because of that condition, even any slight impact, such as scratching or bumping objects, leads to bleeding. "[B]lood pours out." VRP vol. 7, at 405. He wears a glove on one hand almost continuously. His hands bleed at work a lot.

Plaintiff's permanent scarring is extensive. His hands are completely grafted with significant scars. From slitting the skin to graft and the staples to hold it, there are permanent scars over much of his body, including his whole lower back and upper extremities. His legs were completely grafted on both sides, as well as part of his thighs. The doctor summarized: "he's got permanent scars inside and outside that don't just go away when people get out of the hospital." VRP vol. 6, at 127. He wears tinted glasses with partially clear lenses to hide the scarring around his eyes and on the eyelids.

Plaintiff has decreased sensation in his face, his eyes water and his nose drips constantly, but he is not aware of it so his wife signals him to wipe his nose. VRP vol. 6, at 250. He has a loss of sensation in his hands, as well as around the anus. VRP vol. 6, at 253-54. Because of this his wife has to clean him after bowel movements. VRP vol. 6, at 254.

He has limitations in range of motion, including difficulty in kneeling, and "so much difficulty with his hands". VRP vol. 4, at 213-14, 229. He has problems walking — "he hits things and he falls." VRP vol. 6, at 260. Plaintiff has developed the fear of "being up high and not be able to control his body", VRP vol. 6, at 293, and he "has a very strong anxiety reaction to his eyes being covered." VRP vol. 6, at 293.

The clinical psychologist related, without objection, plaintiff's descriptions of "problems from the accident", to wit:

> He said, I'm ashamed of my body, I'm ashamed about how I look. I used to thing [*sic*] I looked good. I wear a hat, I have a burn spot on the left side of my head. I used to swim. I have big scars. I have problems kneeling, my fingers require extra — I can't feel, push down hard to pickup things. I bleed a lot, I scratch myself and blood pours out.
>
> I asked him about his relationship with his wife, he said I try to be macho, I can't tell if I have an erection, I have to look, I have to ask her. I'm burned, and he points from his chest down. I can't tell if body contact is there. It's all graft. Not warm feeling for a woman's body. She always says it is all right. And he said, referring to the sexual side of marriage. It is best not to do it if you can't perform. . . .
>
> Asked him about activities. He said he didn't swim because of scars. He can't climb over stumps and walk like he used to but he does have a good friend that helps him hunt and takes him.

VRP vol. 7, at 404-05.

The clinical psychologist gave these descriptions: (1) "[W]hat we see in Mr. Washburn is a tough, work oriented, honest person who worked extraordinary [*sic*] hard in rehab, who has gone back to work, as you know, with a great deal of disability"; (2) "He lives fearful of his life"; (3) "And he lives still detached from some of the emotional traumas in the things he's been through"; (4) "In my judgment we are seeing either what he focuses on what's happened, a pretty powerful reactive depression . . . or if he doesn't focus on it, then it is a disengagement, a detachment, a pulling away from the things that have happened, and that's not a healthy way to live", VRP vol. 7, at 413; (5) "there is post trauma stress, really has been a powerful trauma here." VRP vol. 7, at 414.

Plaintiff exhibits a lot of fatigue; "he doesn't feel like doing anything". VRP vol. 6, at 259. He has become very dependent upon his wife emotionally as well as physically. "[I]t is real hard for him to be out in the world". VRP vol. 6, at 290. His friends have decreased in number. VRP vol. 6, at 290.

Other aspects of plaintiff's losses are illustrated by the following testimony from the care nurse:

Q: What about self-image, that was one of the issues you asked about, Mr. Washburn's self-image following the injury?

A: Yes, again, that died with many different areas. His self-image had to do with his level of independence and the striving to be independent and perhaps doing things that he might not ought to do sometimes, for safety reasons. That he wants so much to be able to build something, that he will try things that he is pretty sure he can't do, and then his wife watches, when she sees something like that happening, then she runs out there and it usually has to do with crawling on the ground or getting underneath something and she is not sure he really can, has the sensation to do a particular task. It has to do — the change in self-esteem has to do with the fact that he doesn't feel the same kind of relationship with his wife any longer, physical relationship. He's not able to help other people, and this I consider a very important aspect of planning for care. That this is a man that we need to find for him something that he can do to help other people because that's how he has defined himself, and at age fifty, he is probably not going to change that much. And right now that's not a part of his life, but that would be one of the areas to begin working towards.

He's very, very, very embarrassed about his body and has tremendous difficulty as far as I'm concerned with allowing someone to look at his body. . . .

VRP vol. 6, at 290-92.

That nurse added another dimension to the long-range damage:

Q: Ms. Kerrick, in your assessment of Mr. Washburn, did he relate any fears to you about being left alone or losing his wife?

A: Yes. Yes, one of my concerns is that we need — someone needs to be [sic] begin planning with him thinking about what he would do if his wife were not available to him.

And it could be, I mean, she could get sick and then he would be a very alone man, I think much more alone than he recognizes. And he tried to make humor out of it and he said — well, you know, I don't know, if I didn't have my wife, there is no other woman that would want me the way I look. Basically, he doesn't — he jokes about it but he doesn't feel that he would be an attractive person for someone else and I don't think he has a very clear awareness of how much his wife does at this point and if she should be away, then he would need a lot of intervention to help him cope with that and develop some new strategies.

VRP vol. 6, at 300-01.

At the time of the accident plaintiff was 50 years old, served in the Navy, and had worked at Boeing as a maintenance electrician steadily since 1973. He and plaintiff-wife had been married about 30 years; had three sons, two of whom are alive. Plaintiff was in good health, never had a major illness or major accident and was an active person. Plaintiff's remaining life expectancy was 22.89 years, that of his wife, 29.53 years.

It is apparent that the amount of a verdict in and of itself cannot sustain a conclusion that it is excessive. Rather inquiry relates to a particular case, a particular plaintiff with those injuries and damages proved at trial. Amount alone cannot equal excessiveness; the fact that $8 million is a large sum of money is beside the point. Bearing in mind our very limited function at this point, and our declared reluctance to interfere with the decision of a jury, it should be and indeed is the rare case where we should substitute our judgment for that of the jury.

When an appellate court modifies a jury verdict, it must be admitted that it plainly is second-guessing the jury. The damage instruction tells the jury that "[t]he law has not furnished us with any fixed standards by which to measure pain, suffering or disability. With reference to these matters you must be governed by your own judgment, by the evidence in the case, and by these instructions." Instruction 19; Clerk's Papers, at 712. Here, there is no claim that there is error in the instructions or that the necessary evidence of pain, suffering and disability does not exist. Therefore, an

appellate court, if it increases or reduces a verdict, is necessarily holding that the award is governed by its own judgment, not that of the jury.

It is for these reasons that the court will not interfere unless the verdict does so shock its conscience that it can say in good conscience that the damages were flagrantly outrageous. What is the meaning of these words? The dictionary relevantly defines "shock" as "a sense of outrage to one's convictions . . . something that causes outrage, horror, stupefaction . . .". *Webster's Third New International Dictionary* 2099 (1981). Synonyms for "outrageous" are "monstrous, heinous, atrocious". It describes that which is "so flagrantly bad that one's sense of decency or one's power to suffer or tolerate is violated". *Webster's*, at 1603.

The trial court heard and saw the entire proceedings. Its conscience was not shocked nor is the conscience of this court after a full review of the record and the exhibits. There is no justification for substituting our judgment for that of the properly instructed jury as to what would reasonably and fairly compensate the plaintiff. The jury was instructed that the law has not furnished any fixed standards by which to measure pain, suffering or disability. Neither has the law furnished this court with any fixed standards.

Finally, defendant argues separately that the verdict was the result of passion and prejudice. Defendant cites brief testimony about plaintiff and his family, describing that testimony as concerning "outside events" in plaintiff's life. These were facts related by an examining psychologist as part of his evaluation. None was objected to and defense counsel cross-examined about part of those facts.

To show passion and prejudice defendant also objects that plaintiff's counsel "emphasized Washburn's heroism to the jury." Brief of Appellant, at 66. Counsel was describing plaintiff's actions in trying to save his co-worker and remaining alert enough to warn others to turn off the propane. Counsel argued "that gives you some measure of the man." VRP vol. 8, at 727. The weakness of defendant's claim of passion and

prejudice is demonstrated by its reliance on the use of one word, "heroism", out of 65 pages of argument. Defendant neglects to advise us that *defense counsel* argued on the subject of "heroism". Defense counsel said: "Don't forget those photographs in the hospital, but think also of Mr. Washburn as a resilient individual who is a hero. He is a personal hero with the way he's fought back." VRP vol. 8, at 747. No objection was made to any of plaintiff's closing argument. Defendant's reliance on only a part of the record on this point is less than candid.

The rule is clear. "Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity as to make it unmistakable." *Bingaman v. Grays Harbor Comm'ty Hosp.*, 103 Wn.2d 831, 836, 699 P.2d 1230 (1985). As in *Bingaman v. Grays Harbor Comm'ty Hosp.*, *supra*, nothing in the record remotely suggests that the jury was prejudiced or incited to passion.

As to the award to Mrs. Washburn, defendant asserts that it is "patently outrageous". In view of the evidence set forth above, we do not agree.

Defendant admits that the marital relationship has suffered, but asserts "Sharon and Norman can still enjoy the companionship of their 30-year marriage." Brief of Appellant, at 68. There was no exception to the damage instruction. Included therein was the loss of consortium to plaintiff's wife of her husband. The court's instruction includes this definition:

> The term "consortium" means the matrimonial fellowship of husband and wife and the right on [*sic*] one spouse to the company, cooperation, and aid of the other in the matrimonial relationship. It includes loves [*sic*], affection, care, services, companionship, including sexual companionship, and society as well as assistance from one spouse to the other.

Instruction 19; Clerk's Papers, at 711. The recited evidence demonstrates extreme damage to all those elements which were properly before the jury.

We uphold the jury verdicts.

## ADMISSION OF PHOTOGRAPHS

Defendant argues that the trial court abused its discretion in admitting 78 photographs of plaintiff and 7 photographs of plaintiff's co-worker, Scottie Holmes, who died from burns 10 hours after the explosion. Defendant's argument raises separate issues.

### ADMISSION OF PHOTOGRAPHS OF PLAINTIFF

We first consider admission of photographs of plaintiff. Defendant states that defense counsel objected to these photographs of plaintiff "as being highly inflammatory, horrible, unduly gruesome and repetitious. (1 RP 55-62; 6 RP 109, 119)." Brief of Appellant, at 54. Defendant states further: "The court admitted all 78 without considering whether their prejudicial impact outweighed their relevance." Brief of Appellant, at 54. Defendant's representation of the state of the record is simply not true.

Defendant first cites volume 1 of the Verbatim Report of Proceedings at pages 55 through 62 in support of its representation. On those pages counsel and the court mainly discussed the Holmes photos, not those of plaintiff. As stated above, defendant now claims that it objected to the plaintiff's photos "as being highly inflammatory, horrible, unduly gruesome and repetitious." Contrast what defense counsel actually said: "Mr. Washburn's photos, sure, that happened to Mr. Washburn. As much as it hurts me as a defendant to have this jury see that, that is fair, that is honest, but not the Holmes' photos." VRP vol. 1, at 60. On the next page defense counsel makes another statement about photos of the plaintiff:

> MR. BEECHER [defense counsel]: Could I add one caveat to the photos of Mr. Washburn? It is my understanding that Mr. Heinbock will use a number of those photos, there may be just these, there may be additional ones, but if I have the feeling he was getting repetitious here, I would reserve the right to request that the Court at least limit the photos to where we don't have repetition — unduly repetitious photos.

VRP vol. 1, at 61.

Contrary to defendant's representations about objections at trial, volume 1 of the Verbatim Report of Proceedings actually shows that as to admission of the photographs of Mr. Washburn, defense counsel said: "that is fair, that is honest". VRP vol. 1, at 60. Again, "I would reserve the right to request that the Court at least limit the photos to where we don't have repetition — unduly repetitious photos." VRP vol. 1, at 61.

Defendant also cites volume 6 of the Verbatim Report of Proceedings at pages 109 and 119, claiming the record there shows that defendant objected to the photos of plaintiff "as highly inflammatory, horrible, unduly gruesome and repetitious." What the record shows at the page cited by defendant, Verbatim Report of Proceedings vol. 6, at page 109 (and page 108) is that plaintiff offered the photos as a single exhibit. Defense counsel stated:

> . . . No objection, as long as they aren't repetitious. In principle I have no objection to the exhibits.
> THE COURT: Well, at the afternoon recess I will see what Mr. Beecher [defense counsel] means by repetitious and deal with it then.

VRP vol. 6, at 108-09. As promised, at the afternoon recess, out of the presence of the jury, the following took place:

> THE COURT: In regard to that Exhibit 36 [the 78 photos], you said you had no objection except as to repetition, and I wasn't sure if you meant repetitious of the slide or —
> MR. BEECHER: I think it's fair. It struck me that by the time we get 78 photos, mostly arms and legs, we really are — it's pretty much the same thing over and over. If there is an answer to that, that I don't perceive — I certainly stand corrected but would think that for the jury to adequately understand the nature of the burns during the recovery process, and I think that this does not show it fully. In other words it doesn't cover the whole time, it's mostly early on, as I understand it. . . .

VRP vol. 6, at 119.

Defense counsel thought the photos did *not* cover the whole recovery period, and expressed his concern that these photos were "pretty much the same thing over and over". VRP vol. 6, at 119. However, when plaintiff's counsel pointed

out that the photos in fact were taken over 18 months, defense counsel said: "I stand corrected." VRP vol. 6, at 120.

A fair and accurate reading of the record shows that defense counsel's only tentative objection was that the photos not be repetitious. His stated belief was that the 78 photos were "pretty much the same thing . . . it's mostly early on, as I understand it." VRP vol. 6, at 119. It was solely in that context he expressed the thought, not an objection, that "[w]e don't need 78 terribly grizzly [sic] photos." VRP vol. 6, at 119.

Defendant's present representations about its objections to the photos is a gross distortion of the record.[6] Any accurate reading of the record demonstrates that the 78 photographs of plaintiff came in without objection. However, even if the record could be read to show an objection, it could only be on the ground that the photos were "grisly" and possibly repetitious.

There was no error.

In theory, all relevant evidence is admissible. ER 402. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence." ER 403. Admission or rejection of photographic evidence lies within the sound discretion of the trial court. *Toftoy v. Ocean Shores Properties, Inc.*, 71 Wn.2d 833, 836, 431 P.2d 212 (1967); *Mason v. Bon Marche Corp.*, 64 Wn.2d 177, 178, 390 P.2d 997 (1964). The trial court's ruling will not be disturbed on appeal in the absence of a showing of abuse of that discretion. *Mason*, at 178; *see generally Brouillet v. Cowles Pub'g Co.*, 114 Wn.2d 788, 801, 791 P.2d 526 (1990) (trial court rulings on admissibility of evidence generally reviewed under an abuse of discretion standard).

The fact that the photographic depiction may be gruesome or unpleasant does not render the evidence inadmissible. *Mason*, at 178; *see* 5 K. Tegland, Wash. Prac., *Evidence* § 95, at 46 (3d ed. Supp. 1992). Photographs of

---

[6]Counsel on appeal is not the same counsel as at trial.

injuries may be gruesome precisely because they accurately depict what has happened to plaintiff. *See Elliot v. Kesler,* 799 S.W.2d 97, 104 (Mo. Ct. App. 1990) (admitted photographs of accident scene and plaintiff's injuries were gruesome, but only because the accident itself was gruesome and not because of any embellishment permitted by trial court).

The photographs are clearly relevant. The condition of plaintiff's body immediately after the explosion is related to plaintiff's damages. *See Traver v. Packaging Indus. Group, Inc.,* 242 N.J. Super. 574, 578, 577 A.2d 876, 877 (1990). The condition of an injured person's body obviously changes, and photographs can preserve a record of the original condition. *See* K. Hughes & B. Cantor, *Photographs in Civil Litigation* 490 (1973). In burn cases, grafting of skin and eventual healing (to the extent it occurs) will improve the appearance of burned areas; photographs taken shortly after the injuries are incurred will record and preserve the pregrafting, prehealing condition of plaintiff. K. Hughes & B. Cantor, at 492. A number of the photographs here were taken 5 days after the explosion and others within the first month. They showed the condition of plaintiff's body at that time.

The photographs are also relevant to illustrate the testimony of the treating physicians and help the jury understand the extent and nature of the injuries and the course of treatment. Even where a witness has described an injury, photographs have evidentiary value in making the description more intelligible. *See Cervone v. Reading,* 371 Pa. Super. 279, 286-87, 538 A.2d 16, 20 (admission of photographs of plaintiff's open wound before and after grafting) (citing *Fahringer v. Rinehimer,* 283 Pa. Super. 93, 423 A.2d 731 (1980)), *appeal denied,* 520 Pa. 586, 551 A.2d 213 (1988). "Much that sounds cold coming from a witness may be better conveyed by a photograph." *Parson v. Chicago,* 117 Ill. App. 3d 383, 390, 453 N.E.2d 770 (1983). The photographs here illustrated the treating physicians' testimony about plaintiff's injuries and the course of treatment.

The photographs are in large part sequential photographs of the course of treatment. Courts have upheld admissibility of photographs of injuries taken during a course of treatment which are accurately reflective of the injuries and the treatment which plaintiff had to undergo. *E.g., Wilson v. Norfolk & W. Ry.*, 109 Ill. App. 3d 79, 94, 440 N.E.2d 238, 250-51 (1982) (admission of photographs depicting plaintiff's burn injuries during course of treatment upheld); *Kelley v. American Motors Corp.*, 130 Ill. App. 3d 662, 676-77, 474 N.E.2d 814, 824 (1985) (44 unquestionably gruesome photographs of burn victim taken during 8-month period admissible; probative value in helping jury understand plastic surgeon's testimony and illustrating course of plaintiff's progress and treatment outweighed any prejudice); *Day v. South Line Equip. Co.*, 551 So. 2d 774, 780-81 (La. Ct. App.) (admissibility of photographs of injuries at various stages of recuperation, including photographs showing results of surgical procedures, upheld), *cert. denied*, 553 So. 2d 474 (La. 1989).

The photographs are also relevant to plaintiff's emotional problems arising from the injuries and his pain and suffering. *See Bruce v. Rogers Oil Tool Servs., Inc.*, 556 So. 2d 922, 926-27 (La. Ct. App. 1990).

Because the photographs are highly relevant to material issues in the case, and objectively and accurately portrayed the condition of plaintiff's body and the treatment he underwent, their probative value is great.

The mere number of photographs is not determinative. Plaintiff was burned over half his body, and most of the remainder of his body was affected because skin was harvested for grafting. Treatment has taken considerable time — the photographs are a sequence of several series showing results of surgical procedures and other treatment over 13½ months. They accurately depict what plaintiff went through. We do not think the number impermissibly excessive. Nor do we find the photographs impermissibly repetitious. They are in large part photographs of plaintiff's condition shortly after the fire, and the many parts of his body affected, and

then sequential sets showing the course of treatment and healing.

We also note that it is quite one thing to look at the 78 photographs alone, and quite another to look at them in light of the rest of the record. We conclude the trial court did not abuse its discretion in admitting the photographs.

## THE PHOTOGRAPHS OF HOLMES

The trial court admitted seven photographs of plaintiff's co-worker, Scottie Holmes, who died from burns shortly after the explosion. Defendant contends that the trial court erred in admitting the seven photographs, claiming the photographs are irrelevant, unduly cumulative, inaccurate, and highly prejudicial. At trial defendant initially questioned whether the photographs accurately showed what plaintiff saw at the scene of the explosion.

The seven photographs of Mr. Holmes were taken at the hospital. Defense counsel complained that the photographs did not accurately portray what plaintiff saw at the scene of the explosion. One of the photographs shows Mr. Holmes' face with a breathing apparatus in his mouth, and Mr. Holmes was covered with a gelatinous-looking substance applied as part of the attempt to save his life.

The trial court originally ruled to exclude the photograph showing Mr. Holmes' face, but the next day reversed that ruling, explaining

> I was reacting to the fact that it really wasn't — more that he didn't have the tubes in him, which is true, but I was not giving enough weight to the relevancy of the fact that that was the only picture that we had of his face. That Mr. Washburn has indicated that is the memory that is most deeply burned in his own mind of seeing Scottie [Holmes] and was not so much the arms, the legs or whatever. But it would be a very human reaction to look at somebody's face at a time like that. . . .
>
> I am reversing myself and finding that it is, on the balancing scale, more relevant than prejudicial and should be allowed into evidence.

VRP vol. 4, at 182. The court kept out the photograph it believed had the least relevance and the most shock potential. VRP vol. 4, at 184-85.

The question of the accuracy of what the photographs depicted, *i.e.*, whether they accurately portrayed what Mr. Washburn saw, came up later during the trial. Out of the presence of the jury, defense counsel questioned Dr. Heimbach (who gave expert testimony on burn care in general, the physiological effects of burns, and care of Mr. Washburn) about the photographs of Holmes. The inquiry was about whether the photographs accurately depicted Holmes as plaintiff Norm Washburn saw him at the accident site. Dr. Heimbach first thought that Holmes would have had some clothing on, but when informed by defense counsel that he was virtually clothing free (the clothing was burned or blown off), the doctor said "[i]f that's true, that's what he looked like." VRP vol. 6, at 122. The doctor explained that the only difference would be in one picture which showed some cuts made by the paramedics because they could not get Mr. Holmes breathing properly, "but the rest of the pictures are certainly what he would have seen." VRP vol. 6, at 122.

Defense counsel stated that "I think I must stand corrected, I didn't believe that was the case." VRP vol. 6, at 122-23. It is at least arguable that defense counsel conceded the accuracy of the photographs, and cannot now complain that they are inaccurate depictions. In any case, Dr. Heimbach's testimony supports the trial court's conclusion that the photographs portrayed what Mr. Washburn saw at the scene. There was ample evidence that he and Holmes were close together during the fire (Mr. Washburn used his hands to try to smother the fire on Mr. Holmes), that plaintiff was conscious, and that plaintiff saw Holmes burning with skin falling off as well as later when they were close together on the ground after the fire was out.

Because of the clear connection of other admissible evidence to the photographs, they are quite relevant to plaintiff's damages. A psychologist testified that when Mr. Washburn described the explosion to him over 3½ years after the accident, Mr. Washburn's "tears and the emotion and the pain that he was experiencing, almost as though he could

visualize it as he told it; as though he could hear the voices and the screams. It was very real." VRP vol. 7, at 403. The psychologist testified that Mr. Washburn suffers from post-trauma distress, which has left him, among other things, with a profound fear of dying. A substantial element of plaintiff's ongoing damage is his memory of the awful event, including the horrifying scene of Holmes burning to death before his eyes.

When shown one of the Holmes photographs, the psychologist testified that it was consistent with the clinical interview he had with plaintiff and the evident distress plaintiff was experiencing.

The photographs were relevant to help the jury understand what plaintiff saw and the profound psychological impact on plaintiff resulting from seeing the burning of his co-worker who died, and to help the jury understand the effect that had on plaintiff and its relation to his own profound fear of dying.

Defendant complains that the photographs are unduly cumulative. Plaintiff saw Mr. Holmes running in circles, burning with flesh falling off him, and then when they both were on the ground. The seven photographs are different views of Mr. Holmes, and thus reflect what plaintiff saw.

Defendant complains that the photographs are highly inflammatory and grisly. There is no question that the photographs are very gruesome. They reflect what plaintiff saw, however, and what he saw was horrible.

Defendant claims that counsel told the jury it *had* to look at the Holmes photographs. Defendant has failed to explain the basis for this claimed error. In any event, plaintiff's counsel did not tell the jurors it was their duty to look at the photographs. Plaintiff's counsel said to the jury that plaintiff "has been haunted by this. He has dreams about it and *if you choose to look at the photographs of Mr. Holmes,* you will understand why he is haunted by this . . .". (Italics ours.) VRP vol. 8, at 725. Also, by explicitly letting the jurors know they had a choice whether to look at the photographs, dramatic effect was minimized. *Cf. John Doe v. Johnston,* 476

N.W.2d 28, 32-33 (Iowa 1991) (jurors instructed to listen to testimony but not to look at 21 color slides of surgical procedure accompanying testimony if it made them queasy; any purely dramatic effect of the slides minimized).

Defendant also maintains that the seven photographs are irrelevant because plaintiffs' suit is based on Mr. Washburn's physical injuries and emotional injuries resulting from the physical injuries. Defendant says that in order to assert a claim for emotional distress suffered as a result of viewing injuries to a third person, that person must be a family member, citing *Grimsby v. Samson*, 85 Wn.2d 52, 60, 530 P.2d 291, 77 A.L.R.3d 436 (1975).

██ ██ Defendant did not bring this issue to the attention of the trial court, and it is not properly before this court. *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992). In any event, the contention is without merit. *Grimsby* concerns claims for emotional distress damages resulting from conduct directed at a third party. Plaintiff seeks damages for injury to himself resulting from conduct affecting him directly, and part of what happened in the explosion was plaintiff's seeing his co-worker burn to death while he was close enough to try to put the flames out.

As we said in connection with the Washburn photographs, it is one thing to look at the Holmes photographs alone, but quite another thing to look at the Holmes photographs in light of the entire record. We conclude that the trial court did not abuse its discretion in admitting the Holmes photographs.

Finally, we note most of the cases cited by defendant are either criminal cases where certain photographs of the victim have been excluded or civil cases where *exclusion* of photographs has been upheld on review. In its reply brief, defendant cites a 1953 civil case where the reviewing court held the admission of a photograph of a decedent in a wrongful death action was error. *Ryan v. United Parcel Serv., Inc.*, 205 F.2d 362 (2d Cir. 1953). While a single case may be persuasive in a given set of circumstances, the lack of much cited authority directly on point serves to indicate

that this is an area where the trial court's exercise of discretion is frequently upheld, particularly in more recent cases.

This record demonstrates the trial court gave much thoughtful consideration to the admissibility of the photographs, especially the Holmes photographs, with the trial court carefully considering possible prejudice from admission. We uphold admission of all the photographs.

### SHARE OF VERDICT TO BE PAID

Prior to trial three defendants settled and were released by plaintiffs. Petrolane, Inc., paid $780,000 in settlement, Buckeye Gas Products Company paid $520,000, and Washington Natural Gas paid $210,000. As required by RCW 4.22.070(1), the jury in this case apportioned fault among all entities causing plaintiffs' damages. The jury found that defendant Beatt was 80 percent at fault, and that Petrolane, Inc., was 20 percent at fault. The jury determined that Buckeye Gas Products Company, Washington Natural Gas, and other entities (expressly including Boeing) were not at fault.

In a cross appeal, plaintiffs contend that the trial court erred in calculating the amount of the judgment against defendant Beatt. This issue arises because there is a fault-free plaintiff, an at-fault nonsettling defendant, and both at-fault and fault-free settling defendants. It is a complex issue of first impression under RCW 4.22.070. The trial court entered judgment against defendant Beatt by calculating 80 percent of the total verdict of $8 million, with a result of $6,400,000, and then reducing that result by amounts paid by settling fault-free entities, $730,000, for a net amount of $5,670,000.

Initially, defendant contends that plaintiffs' argument should not be considered since it was not presented to the trial court. "The appellate court may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). Arguments or theories not presented to the trial court will generally not be considered on appeal. *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992); *In re Marriage of Tang*, 57 Wn. App. 648, 655, 789 P.2d 118 (1990).

Plaintiffs agree that they did not argue their interpretation of relevant statutes to the trial court, but maintain that the trial court recognized the interpretation as being a possible interpretation of the statute. Plaintiffs urge this court to consider the issue in that the purpose of argument is to apprise the court of an issue, that the trial court here recognized the issue, and that the bench and bar need this court's interpretation on this difficult issue.

While new arguments are generally not considered on appeal, the purpose of RAP 2.5(a) is met where the issue is advanced below and the trial court has an opportunity to consider and rule on relevant authority. *Bennett v. Hardy*, 113 Wn.2d 912, 917, 784 P.2d 1258 (1990). In order to decide how much defendant Beatt must pay, it is necessary to construe RCW 4.22.070. The record shows that plaintiffs clearly objected to the judgment and the trial judge's comments show he was aware of the construction of RCW 4.22-.070 now advanced by plaintiffs. Moreover, despite plaintiffs' concession that they did not argue their present interpretation of the statute to the trial court, part of the argument they now make was advanced to the trial court (regarding whether the trial court erred by allowing a credit, or offset, against the judgment for the amount paid by settling fault-free entities). Clerk's Papers, at 1005-14. We conclude the argument was adequately presented to the trial court; we will review the issue.

Washington's rule before the tort reform act of 1986 was joint and several liability of concurrent and successive tortfeasors. Peck, *Washington's Partial Rejection and Modification of the Common Law Rule of Joint and Several Liability*, 62 Wash. L. Rev. 233, 235-36 (1987). Where liability was joint and several, each tortfeasor was liable for the entire harm and the injured party could sue one or all of the tortfeasors to obtain a full recovery. *Seattle-First Nat'l Bank v. Shoreline Concrete Co.*, 91 Wn.2d 230, 234-36, 588 P.2d 1308 (1978). The rule was codified at RCW 4.22.030, which prior to the tort reform act of 1986 provided that "[i]f more than one person is liable to a claimant on an indivisible

claim for the same injury, death or harm, the liability of such persons shall be joint and several." *See* Laws of 1981, ch. 27, § 11.

The joint and several liability rule developed when another common law rule provided that contributory negligence on the part of the plaintiff, no matter how slight, was a complete bar to recovery. "Conceptually, the question was whether a totally innocent plaintiff should be permitted to recover the full amount of his or her damages from a wrongdoer whose conduct had concurred with that of another wrongdoer to produce a single and indivisible injury or causally unallocable harm." Peck, 62 Wash. L. Rev. at 236.

At the common law, contribution was not allowed between joint tortfeasors; however, this rule was increasingly subject to criticism, and in 1981 the right to contribution was established in Washington with the basis for contribution being the comparative fault of the tortfeasors. RCW 4.22.040, .050, .060. However, where there was no joint and several liability, there was no right to contribution. RCW 4.22.050; *George v. Parke-Davis*, 107 Wn.2d 584, 601, 733 P.2d 507 (1987); *Glass v. Stahl Specialty Co.*, 97 Wn.2d 880, 886-87, 652 P.2d 948 (1982).

The rule that plaintiffs' contributory negligence was a complete bar to recovery, like the no-contribution rule, was also subject to criticism. In 1973 comparative negligence was adopted in Washington, under a "pure" comparative negligence scheme which allows a plaintiff to recover some damages even if plaintiff's fault is greater than that of defendant's. Peck, 62 Wash. L. Rev. at 235-37 (summarizing development of the law).

Largely due to the adoption of the comparative negligence rule, an argument developed against joint and several liability. Given that plaintiff's negligence was no longer a bar to recovery, it was argued that it was unjust to impose joint and several liability on a tortfeasor whose wrong combined with that of plaintiff and others to cause the harm. "In other words, responsibility for harm done should be distributed in proportion to the fault of all of the parties involved and not

governed by concepts of causation." Peck, 62 Wash. L. Rev. at 238.

In addition to this argument, concerns about affordable liability insurance were voiced to the Legislature. *See* Laws of 1986, ch. 305, § 100. As a result, RCW 4.22.030 was amended to provide that joint and several liability is the rule for liability on an indivisible claim where there are concurrent and successive tortfeasors "*[e]xcept as otherwise provided in RCW 4.22.070* . . .". (Italics ours.) RCW 4.22.070 was enacted as part of the tort reform act of 1986.

Thus, to decide how much of the $8 million verdict defendant Beatt must pay, we must examine RCW 4.22.070. Our goal is to construe the statute to give effect to the intent of the Legislature. *Yakima v. International Ass'n of Fire Fighters, Local 469*, 117 Wn.2d 655, 669, 818 P.2d 1076 (1991). We look for intent as it is expressed in the language of the statute. *Draper Mach. Works, Inc. v. Department of Natural Resources*, 117 Wn.2d 306, 313, 815 P.2d 770 (1991). Statutes should be read as a whole. *Avlonitis v. Seattle Dist. Court*, 97 Wn.2d 131, 138, 641 P.2d 169, 646 P.2d 128 (1982). Particularly in this case, the sections of RCW 4.22.070 must be carefully read together because terms of art found in some sections are explained in other sections.

RCW 4.22.070(1) and (1)(b) provide:

(1) In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages, including the claimant or person suffering personal injury or incurring property damage, defendants, third-party defendants, entities released by the claimant, entities immune from liability to the claimant and entities with any other individual defense against the claimant. Judgment shall be entered against each defendant except those who have been released by the claimant or are immune from liability to the claimant or have prevailed on any other individual defense against the claimant in an amount which represents that party's proportionate share of the claimant's total damages. The liability of each defendant shall be several only and shall not be joint except:

. . . .

(b) If the trier of fact determines that the claimant or party suffering bodily injury or incurring property damages was not

at fault, the defendants against whom judgment is entered shall be jointly and severally liable for the sum of their proportionate shares of the claimants [*sic*] total damages.

From this part of RCW 4.22.070, it is clear that several liability is now intended to be the general rule.[7] The statute evidences legislative intent that fault be apportioned and that generally an entity be required to pay that entity's proportionate share of damages only. The statute also evidences legislative intent that certain entities' share of fault not be at all recoverable by a plaintiff; for example, the proportionate shares of immune parties.

However, under RCW 4.22.070(1)(b), joint and several liability exists where there is a fault-free plaintiff. Significantly, however, the form of joint and several liability which exists where there is a fault-free plaintiff is not, under RCW 4.22.070, the same as the joint and several liability which existed prior to the tort reform act of 1986. Where, prior to the tort reform act of 1986, "pure" joint and several liability enabled a plaintiff to sue one tortfeasor and recover all of his or her damages from one of multiple tortfeasors, RCW 4.22.070(1) and (1)(b) do not permit that.

Under RCW 4.22.070(1)(b), *only* defendants against whom judgment is entered are jointly and severally liable and only for the sum of *their* proportionate shares of the total damages. A defendant against whom judgment is entered is specifically defined by RCW 4.22.070(1) as "each defendant except those who have been released by the claimant or are immune from liability to the claimant or have prevailed on any other individual defense . . .". Thus, settling, released defendants do not have judgment entered against them within the meaning of RCW 4.22.070(1), and therefore are not jointly and severally liable defendants.

The only jointly and severally liable defendant here is defendant Beatt. Petrolane, Inc., is not a jointly and severally liable defendant because it was released.

---

[7]While RCW 4.22.030 suggests that RCW 4.22.070 is an exception to a general rule, RCW 4.22.070 is in fact an exception that has all but swallowed the general rule. Harris, *Washington's 1986 Tort Reform Act: Partial Tort Settlements After the Demise of Joint and Several Liability*, 22 Gonz. L. Rev. 67, 73 (1986-1988).

RCW 4.22.070(2) provides:

> If a defendant is jointly and severally liable under one of the exceptions listed in subsections (1)(a) or (1)(b) of this section, such defendant's rights to contribution against another jointly and severally liable defendant, and the effect of settlement by either such defendant, shall be determined under RCW 4.22.040, 4.22.050, and 4.22.060.

Defendant claims that RCW 4.22.070(2) applies here and directs that RCW 4.22.060 be applied. RCW 4.22.060(2) provides that a claim of a releasing person against other persons is reduced by the amount of the settlement if reasonable. Defendant argues for application of this provision for a credit, or offset, against what a nonsettling defendant has to pay of a total verdict.

Under RCW 4.22.070(2), however, *if* defendants are jointly and severally liable under subsection (1)(a) or (1)(b), *then* those defendants have rights of contribution as to each other, RCW 4.22.040, .050, and the effect of a settlement by such a jointly and severally liable defendant is to be determined under RCW 4.22.060. By its terms, RCW 4.22.070 restricts credits, or offsets, by amounts paid by settling defendants to amounts paid by *jointly and severally liable* settling defendants. In other words, where there is a fault-free plaintiff, RCW 4.22.070(1), (1)(b) and (2) direct application of RCW 4.22.060 *only if* there are jointly and severally liable defendants. Thus, under the plain language of the statute the effect of settlement statute (RCW 4.22.060) does not apply in the circumstances here because there are no settling jointly and severally liable defendants.

Plaintiffs argue, however, that RCW 4.22.070(2) is internally inconsistent with RCW 4.22.070(1)(b). They contend that by referring to jointly and severally liable settling defendants, RCW 4.22.070(2) is inconsistent with that part of subsection (1)(b) which speaks only of joint and several liability with respect to defendants *against whom judgment is entered.*

This argument simply overlooks the plain language of subsection (2). That subsection speaks of defendants who are

jointly or severally liable under *either* RCW 4.22.070(1)(a) *or* (1)(b). If liability is under (1)(a) (not the case here), liability is premised on parties who "were acting in concert or when a person was acting as an agent or servant of the party." Liability under subsection (1)(a) is joint and several. With this in mind, it is easy to see why RCW 4.22.070(2) refers to the possibility of jointly and severally liable settling defendants. Where liability is premised on subsection (1)(a), one of two parties acting in concert, or in agency situations, can settle while still being a jointly and severally liable defendant. Further, plaintiffs appear to overlook the possibility of RCW 4.22.070(2) applying to postjudgment settlements.

There is thus no inconsistency between RCW 4.22.070(2) and subsection (1)(b), contrary to plaintiffs' position, and it is clearly possible to give meaningful effect to all the statutory language.

■■■ How much of the total verdict must defendant Beatt pay? Under RCW 4.22.070(1) judgment is entered against a defendant "in an amount which represents that party's proportionate share of the claimant's total damages." The jury found defendant 80 percent at fault. Beatt must pay 80 percent of the total verdict. There are no other jointly and severally liable defendants (those against whom judgment has been entered). Defendant Beatt is entitled to no credit or offset for any amounts paid by any settling entities, whether fault-free or at-fault, because none of those entities are jointly and severally liable defendants within the meaning of the express language of RCW 4.22.070. RCW 4.22.070(2) does not apply, and thus does not direct that RCW 4.22.040, .050, or .060 is to be applied. Had there been more than one defendant against whom judgment was entered according to RCW 4.22.070(1), then, as among those defendants, there would have been joint and several liability. If any settling defendants were jointly and severally liable, then RCW 4.22-.070(2) would have been applicable.

As a policy matter, defendant argues that if there is no reduction from defendant's proportionate share for amounts

paid by settling entities, plaintiff may recover more than plaintiff's actual damages, in contravention of policy favoring only one full recovery for plaintiff.

We note, however, first, that a plaintiff suing only one defendant is in the same position. If the plaintiff settles for more than what a trier of fact might ultimately determine total damages are, plaintiff has more than "one full recovery". Similarly, a plaintiff suing only one defendant may receive less than total damages as a result of the settlement, also a possibility under our holding here. While plaintiff has the possibility of obtaining a seeming windfall, plaintiff also bears the burden of the possibility of less than full recovery. Unlike the law existing before the tort reform act of 1986, under which a solvent jointly and severally liable tortfeasor might be required to bear the burden of insolvency of other tortfeasors, the law now puts a heavier burden on the plaintiff who settles with an entity for an amount less than that entity's share of fault as determined by the trier of fact.

The truth is, very few cases result in plaintiff obtaining exactly one full recovery, no more and no less, regardless of the method of crediting, or offsetting, used.

Second, defendant is not harmed and cannot complain that it is being asked to pay more than its share of damages resulting from its share of fault. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 431 (Tex. 1984).

Amicus Washington State Trial Lawyers Association (WSTLA) argues that settlements should be encouraged, and that they will be encouraged if the sum of the proportionate shares in RCW 4.22.070(1)(b) includes the shares of settling at-fault entities, with judgment against nonsettling defendant(s) offset by the amount of any settlement with at-fault entities. WSTLA reasons that potentially fault-free plaintiffs will be inclined to settle because they will know in advance of trial the consequences of settlement and will not bear the entire risk of an adverse settlement. WSTLA also reasons that since nonsettling defendants will bear the risk

of being responsible for the proportionate shares of at-fault settling entities, nonsettling defendants will have a stake in a reasonableness hearing in much the same way as before RCW 4.22.070 was enacted.

For three reasons, this argument is unconvincing. First, RCW 4.22.070(1) provides that "[j]udgment shall be entered against each defendant *except those who have been released by the claimant . . .*". (Italics ours.) RCW 4.22.070(1)(b) provides that if the plaintiff is found to be fault-free, "the defendants against whom judgment is entered shall be jointly and severally liable for the sum of *their proportionate shares* of the claimants [*sic*] total damages." Under these provisions, the proportionate share of a released entity is *not* part of the sum of proportionate shares referenced in RCW 4.22-.070(1)(b). *See* Peck, 62 Wash. L. Rev. at 243; Harris, *Washington's 1986 Tort Reform Act: Partial Tort Settlements After the Demise of Joint and Several Liability*, 22 Gonz. L. Rev. 67, 91 (1986-1988).

Second, WSTLA's argument appears to put the cart before the horse, arguing the necessity of defendant's involvement in reasonableness hearings without demonstrating the necessity of the hearings themselves. We do not address the latter issue, but note that WSTLA's policy argument assumes their necessity. Deciding the necessity of reasonableness hearings must await another day.

Third, while it can be said in advance of trial that a plaintiff may be potentially fault free, that plaintiff may in fact be found by the trier of fact to be partially at fault. Should that be the case, and if RCW 4.22.070(1)(a) and (3) are inapplicable, then liability in the case of a single indivisible harm will be several only. In such circumstances a plaintiff will bear the risk of any adverse settlement (just as when there is only one defendant, as explained above) with considerable uncertainty about the ultimate recovery following a trial. Given such uncertainty built into RCW 4.22.070's "general rule" of several liability, and the fact that the question of plaintiff's fault is not determined by a trier of fact until close of trial, we have considerable doubt that the

Legislature intended that the statute be construed according to the policy argued by WSTLA, particularly in the face of statutory language which contradicts that proposed construction. *See generally* Harris, 22 Gonz. L. Rev. at 82 (Legislature has shown by provisions of RCW 4.22.070 "that it is not concerned with claimant uncertainty regarding the effects of partial settlement").

We remand with directions to the trial court to modify the judgment entered against Beatt.

### Partial Summary Judgment — Reinstatement of Defendant

Defendant challenges a preliminary ruling made on the motion calendar. Early on in the proceedings, on March 29, 1989, the trial court granted defendant's motion for partial summary judgment of dismissal of defendant from the action. The order of partial summary judgment contained the certification and entry of judgment language required by CR 54(b) and RAP 2.2(d) ("[t]here being no just reason for delay, the Clerk of the Court is hereby directed to enter this order . . .", Clerk's Papers, at 287). Plaintiffs later moved to reinstate defendant as a party to the action, at which time it came to plaintiffs' counsel's attention that the order contained the certification language. Plaintiffs then moved pursuant to CR 60(b) for vacation of the partial summary judgment. The trial court granted the motion, in part because the court said that it had never intended that the judgment be a final judgment, but instead the trial court intended that plaintiffs could request reinstatement if discovery led to support for the theory that the builder's statute of repose did not apply.

Defendant contends that by moving under CR 60(b) for vacation of the judgment plaintiffs admitted that the partial summary judgment was a final judgment, that plaintiffs are bound by that theory and cannot now argue that the partial summary judgment was not a final judgment, that vacation was improper under CR 60(b), and, in any case, that service required under CR 60(b) was improper and the court therefore lacked jurisdiction to vacate the partial summary judgment order.

Defendant's arguments are without merit.

 In *Fox v. Sunmaster Prods., Inc.*, 115 Wn.2d 498, 503, 798 P.2d 808 (1990), we held that the "no just reason for delay" finding is insufficient to satisfy CR 54(b) and RAP 2.2(d) unless the record "affirmatively show[s] there is in fact some danger of hardship or injustice that will be alleviated by an immediate appeal." *Fox*, at 503. Pro forma language to that effect is insufficient. *Fox*, at 504. The record here does not indicate that there was no just reason for delay, and defendant does not argue that there was. Instead, the language in the summary judgment order is simply pro forma language of the kind disapproved in *Fox* and *Doerflinger v. New York Life Ins. Co.*, 88 Wn.2d 878, 567 P.2d 230 (1977). Therefore the partial summary judgment was not a final appealable order.

Defendant asserts, however, that *Fox* does not apply because it concerns a version of CR 54(b) requiring written findings supporting certification, while CR 54(b) as it existed when partial summary judgment was entered did not. Counsel's bald assertion overlooks the fact that regardless of the written finding requirement now in the rule, the holding in *Fox* upon which this matter turns is not new. *See Doerflinger v. New York Life Ins. Co., supra* at 882. Regardless of written findings, the record must still demonstrate that there is in fact no just reason for delaying entry of judgment.

Absent a proper certification, an order which adjudicates fewer than all claims or the rights and liabilities of fewer than all parties is subject to revision at any time before entry of final judgment as to all claims and the rights and liabilities of all parties. CR 54(b); *see Fox*, at 504. The partial summary judgment order was not properly certified and it was not a final judgment; the trial court had the authority to modify the order at any time prior to final judgment.

 Further, plaintiffs' attempt to use, and the trial court's consideration of, CR 60(b) does not change the result. As defendant acknowledges, CR 60(b) is not the proper vehicle to

use where interlocutory orders are concerned. Brief of Appellant, at 24 n.8. *See* CR 60(b) (pertaining to *"final* judgment, order, or proceeding"* (italics ours)); *see generally* 11 C. Wright & A. Miller, *Federal Practice* § 2852, at 145 & nn.27-28 (1973) (Fed. R. Civ. P. 60 (relief from judgment) is not applicable in the case of an interlocutory judgment or order; instead at any time before entry of final judgment trial court has plenary authority to afford such relief as justice requires); *accord, O'Neill v. Southern Nat'l Bank,* 40 N.C. App. 227, 252 S.E.2d 231 (1979); *Thompson v. Goetz,* 455 N.W.2d 580 (N.D. 1990). Plaintiffs' erroneous reliance on the rule and the trial court's consideration of the matter as a CR 60(b) motion did not adversely affect the trial court's power to modify the order. *See Zimzores v. Veterans Admin.,* 778 F.2d 264 (5th Cir. 1985). Nor does the error as to the legal propriety of use of CR 60(b) bind this court to an erroneous view of the law. *See State v. Knighten,* 109 Wn.2d 896, 902, 748 P.2d 1118 (1988) (plurality) (erroneous concession as to point of law not binding on court); *In re Estate of Dunn,* 31 Wn.2d 512, 528, 197 P.2d 606 (1948) (same).

In conclusion, the partial summary judgment was not a final judgment and the trial court had authority under CR 54(b) to modify it regardless of CR 60(b). We uphold the trial court's reinstatement of defendant as a party to this action.

Finally, we grant defendant's motion to strike plaintiffs' answer to the brief of amicus curiae Associated General Contractors of Washington.

DORE, C.J., and UTTER, ANDERSEN, DURHAM, SMITH, and JOHNSON, JJ., concur.

DOLLIVER, J. (concurring) — I write separately because I disagree with the majority's presentation of the issue. I uphold the jury's verdict, however, because I believe, without further legislative guidance on the intended scope of the

1986 amendment to RCW 4.16.300, that jury instruction 17 comports with the ordinary meaning of the term "manufacturer".

The majority limits its analysis to whether the defendant is a manufacturer under jury instruction 17 because the defendant proposed and never excepted to that instruction. See majority, at 255-57. However, the defendant proposed the instruction only after it moved for summary judgment and a directed verdict objecting to the theory that it was a manufacturer. Under these circumstances, the failure to object to an instruction does not make that instruction the law of the case. *See Rhoades v. DeRosier*, 14 Wn. App. 946, 948 n.2, 546 P.2d 930 (1976); *Geer v. Sound Transfer Co.*, 88 Wash. 1, 3, 152 P. 691 (1915); *see generally* 75B Am. Jur. 2d *Trial* § 1461 (1992); 88 C.J.S. *Trial* § 414 (1955); *cf. Mutual of Enumclaw Ins. Co. v. Cox*, 110 Wn.2d 643, 651, 757 P.2d 499 (1988) (an instruction will not become the law of the case when the trial court and opposing party knew the objecting party's position).

The issue presented for resolution is whether the defendant is within the class of persons protected by the statute of repose. The statute protects "person[s]" from "all claims or causes of action of any kind . . . arising from such person having constructed, altered or repaired any improvement upon real property," but does not apply "to claims or causes of action against manufacturers." RCW 4.16.300.

The plaintiffs argue that a builder who engages in any "manufacturing" activity loses the protection of the statute of repose. The plaintiffs contend the definition of "manufacturer" in the product liability act (RCW 7.72) (PLA) is applicable, and if a builder meets that definition, then it falls outside the protections of the statute of repose. Conversely, the defendant argues the PLA definition of manufacturer does not apply and only "pure manufacturers" fall outside the scope of the statute. The defendant relies on the context in which the amendment was enacted together with some legislative history to argue that the amendment only applies

to "manufacturers of asbestos and other pre-manufactured products." Brief of Appellant, at 38.

Neither argument is entirely persuasive. While the statute of repose and the PLA are related in that claims against manufacturers must now be brought under the PLA, the Legislature did omit any reference to the PLA in the 1986 amendment. See Reply Brief of Appellant app. C (Second Draft, Proposed SHB 573); Brief of Appellant app. H (voice vote deleting reference to PLA). Further, although there is some indication that the Legislature wanted to ensure it could pursue its claims against asbestos manufacturers, I am not persuaded the legislative history forecloses a broader definition of manufacturer. Consequently, the legislative intent regarding the scope of the amendment must be determined by reference to the ordinary meaning of its terms. *See Dennis v. Department of Labor & Indus.*, 109 Wn.2d 467, 745 P.2d 1295 (1987).

A problem arises because the ordinary meanings of *construct* and *manufacture* seem to be synonymous. "Construct" means "to form, make, or create by combining parts or elements". *Webster's Third New International Dictionary* 489 (1971). "Manufacture" is defined as "to make from raw materials by hand or by machinery". *Webster's*, at 1378. "Raw material" is "material available, suitable, or required for manufacture, development, training, or other *finishing process* but not yet so used". (Italics mine.) *Webster's*, at 1887. In addition, the PLA definition of manufacturer includes the term "construct", but this term is also used in the statute of repose in defining persons who fall within its protection — persons who have "constructed . . . any improvement upon real property". RCW 4.16.300.

Given the far-reaching consequences of this case, I am reluctant on the scant legislative history of the amendment and the synonymous meanings of "construct" and "manufacture" to divine the legislative intent regarding the applicability of the statute of repose to the defendant in this case. My sense is that the crux of this issue does not lie in

whether Beatt Equipment Company engaged in the activity of construction or manufacturing, but rather in whether the result of its activity yielded an "improvement upon real property" or a "product" and in whether the injury was caused by the product or the improvement. *Cf. Condit v. Lewis Refrigeration Co.*, 101 Wn.2d 106, 676 P.2d 466 (1984) (a conveyor belt and refrigeration unit within an improvement to real property are more properly the subject of product liability law).

Lacking legislative guidance, however, I uphold the verdict because I believe the jury found the defendant was a manufacturer under a definition which comports with the ordinary meaning of that term.

GUY, J., concurs with DOLLIVER, J.

Reconsideration denied February 3, 1993.