IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31037-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER GEORGE NICHOLS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Christopher Nichols felt the full weight of the changes in sentencing law made by the 1995 "Hard Time for Armed Crime" Act when he received a 127.5-year sentence for crimes arising out of a single incident: a burglary, in which the ex-felon stole a gun safe containing 23 firearms. He appeals, arguing that the trial court erred in admitting evidence of a roughly contemporaneous murder committed by his accomplice in the burglary, and in refusing to consider his request for an exceptional downward sentence. Because we find no error and a statement of additional grounds filed by Mr. Nichols has no merit, we affirm.

FACTS AND PROCEDURAL BACKGROUND

On July 20, 2012, a community corrections officer made a call to the Stevens County home of a probationer, and the door was answered by the probationer's brother,

Eric Booth. Lacerations and contusions on Booth's face matched a description of injuries the officer had been told had likely been sustained by a person involved in the murder of 63-year-old Gordon Feist several days earlier. Feist had been found dead in the driver's seat of his utility vehicle, which had crashed into a power pole off a road near his home. Examination of his body revealed that before the crash (and evidently precipitating it) Feist had been shot twice in the right side of his head. Damage to the windshield and dashboard suggested that the shooter had been sitting in the front passenger's seat, had been thrown forward violently when the utility vehicle crashed into the pole, and would have sustained significant facial injuries as well as injury to one or both knees.

Deputies had recovered two handguns at the scene of the accident. The first was a revolver belonging to Mr. Feist and the second was a .22 magnum Derringer pistol, which had been used to kill Mr. Feist. The serial number on the Derringer showed that it was one of 23 firearms that had been stolen (along with other items) from Stevens County resident Robert Hannigan about a month earlier.

Given Mr. Booth's injuries, and because he was acting nervous, the corrections officer contacted the sheriff's department and Detective Michael Gilmore traveled to the Booth home. Within the prior week, the sheriff's department had been contacted by witnesses who had come across both a Honda car that had been taken during the burglary of the Hannigan home and a number of the stolen guns. The Honda car had been found abandoned, pushed over an embankment. The guns had been found after the owner of

2

property on Old Dominion Road came across a pried-open gun safe on state land near his property. When sheriff's deputies searched the area, they found other items stolen in the Hannigan burglary, including the guns, which had been buried in black trash bags.

Upon seeing Mr. Booth's injuries, Detective Gilmore found them to be consistent with those that would have been suffered by Mr. Feist's passenger. He also saw a box of trash bags with red drawstrings inside the Booth home that were identical to the bags recovered with the buried firearms. The detective arrested Mr. Booth on suspicion of murder after Mr. Booth's father told the detective that he first saw his son's injuries on the prior Sunday night or Monday morning—timing consistent with the Feist murder— that he did not believe his son's story about having sustained the injuries in a motorcycle accident, and that his son had performed work at Mr. Feist's property several weeks earlier. A search of Mr. Booth's vehicle pursuant to a search warrant resulted in the discovery of a Walther .22 caliber pistol and other items stolen from the Hannigan home.

Mr. Booth confessed to the murder of Mr. Feist on July 26. He told detectives that on the day of the murder, he and two friends, Collette Pierce and Jesse Fellman-Shimmin, had driven to Mr. Feist's house intending to burglarize it. Mr. Booth knew from performing a plumbing job at the residence that Mr. Feist owned a safe containing money and other valuables. The three friends parked about a mile down the road and walked up to the house. Mr. Booth had brought the Derringer, which he had obtained several weeks earlier when he and the defendant, Christopher Nichols, burglarized the

3

Hannigan home. Mr. Fellman-Shimmin was armed with a crowbar. When they arrived at the house, Ms. Pierce knocked on the door and, when Mr. Feist answered, told him a story about running out of gas.

Mr. Feist, who was armed with a revolver, retrieved a can of gas from his garage, put it in the back of a utility vehicle and told the three that he would give them a ride to their car. They climbed aboard but as they drove toward the car, Mr. Booth became worried that Mr. Feist was going to figure out what they were up to and would shoot him—so Mr. Booth shot first, hitting Mr. Feist twice in the head. Mr. Fellman-Shimmin was the only one able to jump out of the vehicle before it crashed into a power pole. Mr. Booth and Ms. Pierce were thrown forward and Mr. Booth lost hold of the Derringer. Unable to find it, he left it at the scene of the accident.

The three ran back to Mr. Fellman-Shimmin's car and drove to a nearby campground, where they started a campfire and burned their bloodied clothing. Mr. Fellman-Shimmin called Mr. Nichols to say they needed help and Mr. Nichols drove to the campground to meet them. Upon learning that Mr. Booth had left the stolen Derringer behind, Mr. Nichols was upset. He drove to the reported scene of the accident, only to have to turn back because the sheriff's department was already there.

Mr. Booth confessed to the Hannigan burglary as well, telling Detective Gilmore that he had previously worked at the Hannigan home and had burglarized it with Mr. Nichols. Mr. Booth drove, and left his car outside a locked gate on the driveway. After

4

he and Mr. Nichols determined that no one was home, they found a way in and took a number of items, including jewelry, $10,000 worth of ammunition, and a locked gun safe located in a bedroom closet, which they moved outside using a dolly. They took a Honda car from the garage, loaded the stolen items into it, and Mr. Nichols drove the car to the driveway gate, where the two men cut the lock. They then drove in separate cars to a piece of remote state land not far from Mr. Booth's home, where they hid the stolen property. Mr. Nichols told Mr. Booth that he knew a place to dump the Honda car; Mr. Booth followed him to a spot on Cole Road, where Mr. Nichols put the car in neutral and pushed if off the road into a ravine.

Mr. Booth told detectives that at some point after the burglary, Mr. Nichols enlisted the help of Mr. Fellman-Shimmin to break into the safe. Mr. Fellman-Shimmin worked at a wrecking yard and had access to heavy tools. Mr. Nichols drove to the wrecking yard to pick up Mr. Fellman-Shimmin, who brought two crowbars, and the two men drove in Mr. Nichols's truck to where the safe was hidden under a large pile of brush. They were soon joined by Mr. Booth. After they pried open the safe, they sorted the guns based on their value and which would be easiest to sell.

Mr. Fellman-Shimmin kept two guns as compensation for opening the gun safe. The men took some of the guns with them and placed others in garbage bags and buried them in the ground.

5

Mr. Booth told officers that Mr. Nichols and he had later driven into Spokane, where Mr. Nichols had pawned two of Mr. Hannigan's rings at a Pawn 1 store and the men had scrapped Mr. Hannigan's belt buckles at Pacific Steel and Recycling. Detective Gilmore was quickly able to confirm that Mr. Nichols had pawned two rings at Pawn 1 and drove to Mr. Nichols's home the same day to question him about any involvement with Mr. Booth, Mr. Fellman-Shimmin, or Ms. Pierce in the Feist murder or burglaries involving firearms. Mr. Nichols denied involvement on all counts.

Detective Gilmore thereafter traveled to Pawn 1, determined that it had required picture identification from Mr. Nichols, obtained the receipt signed by Mr. Nichols, and obtained the Hannigans' identification of the pawned rings. Based on that evidence and Mr. Booth's statement, the State charged Mr. Nichols and an arrest warrant issued on August 8. Mr. Nichols was charged with one count of residential burglary, nine counts of theft of a firearm, one count of theft of a motor vehicle, nine counts of first degree unlawful possession of a firearm, and one count of first degree trafficking in stolen property.

Based on Mr. Booth's admission that he and Mr. Fellman-Shimmin had shot some of the stolen firearms at the home of Mr. Nichols's girl friend, detectives executed a search warrant at her home on August 17. They found ammunition and two of the firearms stolen from Mr. Hannigan. A lab analysis matched fingerprints on one of the guns to those of Mr. Nichols.

At the time Mr. Booth provided his statement to detectives, Mr. Fellman-Shimmin was in jail, having been arrested for a probation violation. Ms. Pierce was arrested the day after Mr. Booth provided his statement. Both Mr. Fellman-Shimmin and Ms. Pierce initially denied any involvement in the Feist murder, but both later relented and agreed to provide statements that proved to be consistent with Mr. Booth's. Mr. Booth, Mr. Fellman-Shimmin, and Ms. Pierce all eventually reached plea agreements requiring that they testify against Mr. Nichols. Among other inculpatory information they could provide, all three told detectives that when Mr. Nichols met them on the night of the Feist murder, he had several of the stolen Hannigan firearms with him.

Among pretrial motions in limine filed by Mr. Nichols was a motion to preclude the State from "making any reference to the contact that allegedly occurred with Christopher Nichols, Jesse Fellman-Shimm[i]n, Eric Booth, or Collette Pierce on the night of the Feist murder or any other reference to any alleged involvement in the crime." Clerk's Papers (CP) at 199. The trial court denied the motion, explaining that it viewed evidence of the events of that night of the Feist murder as res gestae. The court indicated it would consider a limiting instruction as to the evidence, but the defense never requested one.

Evidence at Mr. Nichols's trial included the testimony of Mr. Booth, Mr. Fellman-Shimmin, and Ms. Pierce as to the events of the night of the Feist murder. All three were cross-examined by the defense about their agreements to testify against Mr. Nichols in

7

exchange for reduced sentences for the murder. Other evidence against Mr. Nichols included the testimony of an employee of Pawn 1 who testified that Mr. Nichols had indeed pawned the two Hannigan rings on July 6, and a surveillance video from Pacific Steel taken the same day, which captured Mr. Nichols and Mr. Booth selling the Hannigan belt buckles for scrap. The evidence included a recorded telephone call from the Stevens County Jail between Mr. Nichols and his girl friend, in which she informed Mr. Nichols that she had come home the prior night to find law enforcement executing a search warrant at her home, during which they found a bag with guns in it, bullets, and bullet casings on the ground outside the home. Among statements made during the call were Mr. Nichols's statement that his mother need not worry about hiring a particular defense lawyer because "I'm fucked now," and Mr. Nichols's agreement that his girl friend should say that she did not know which of Mr. Nichols's friends had been in and out of her house when she was not there, or who had "brought shit in and out of [her] house." Report of Proceedings (RP) at 720-21.

The jury found Mr. Nichols guilty of each of the 21 counts charged. Given the standard range for the offenses and the statutory requirement that the unlawful possession of a firearm counts and firearm theft counts run consecutively to one another, those 18 counts alone would result in a standard sentence of 123 to 163.5 years.

The defense asked that the court impose an exceptional sentence downward by either running the 21 counts concurrently or imposing terms below the standard range. It

argued that a life sentence was excessive for a single act of theft, was disproportionate compared to the punishment imposed on like offenders, and was disproportionate considering the comparatively low sentences that Mr. Booth, Mr. Fellman-Shimmin, and Ms. Pierce received for the murder—26.5 years, 25 years, and 15 years, respectively.

The State responded that a standard range sentence was not excessively harsh given Mr. Nichols's criminal history and the fact that the object of the burglary was to steal a gun safe. It argued that the sentence was consistent with the Hard Time for Armed Crime Act (HTACA), Laws of 1995, chapter 129, which was intended to result in lengthy sentences for armed career criminals.

The court acknowledged the harshness of the sentence but observed that the legislature clearly intended that firearm offenses should receive harsh punishment. It imposed 90 months for each first degree unlawful possession of a firearm and 80 months for each firearm theft. For the residential burglary, theft of a motor vehicle, and trafficking in stolen property charges, the court imposed standard range sentences of 84 months, 50 months, and 80 months, respectively. As provided by statute, it ordered that the firearm offenses run consecutively to one another and that they run concurrently with the sentences for burglary, theft, and trafficking. The result was a total sentence of 127.5 years. Mr. Nichols appeals.

ANALYSIS

Mr. Nichols makes two assignments of error: first, that the trial court erred by admitting evidence of an "unrelated murder" in which he was not involved; and second, that it erred by failing to consider his request for an exceptional sentence downward. We address the assignments of error in turn.

### I. Evidence of Gordon Feist murder

One of Mr. Nichols's 14 pretrial motions in limine sought to exclude certain evidence relating to the murder of Gordon Feist. It is important to focus on precisely what Mr. Nichols was seeking to exclude. His 14th motion in limine asked the court to prohibit the State

> from making any reference to the contact that allegedly occurred with Christopher Nichols, Jesse Fellman-Shimm[i]n, Eric Booth, or Collette Pierce on the night of the Feist murder or any other reference to any alleged involvement in the crime.

CP at 199.

When the motion was argued, Mr. Nichols's lawyer was clear that the "contact" he was talking about was his client's "supposedly" traveling to the campground after the "Feist burglary gone bad . . . had been done, and—and, you know, conversations taking place, certain conduct." RP at 127. The prosecutor responded that Mr. Nichols was in possession of two of the stolen firearms that night, and expanded on evidence of the contact:

10

After Mr. Feist was shot, those three individuals went out to Rocky Lake, they were burning their clothes. They made contact with Mr. Nichols. It's alleged that Mr. Nichols then comes out, he's got the Taurus Judge with him that was then later recovered during a search warrant at his girlfriend's house, as well as the AK-47, which is—both those firearms are counts in this—case.

He's alleged to be in possession of them. He's alleged to be waving it around, pointing at them. He's extremely upset because he wasn't included in that burglary. At one point the witnesses will testify that he heard a car coming, he believed it to be law enforcement so he ran up on a hill with the AK-47 and was prepared to open fire on law enforcement.

RP at 130.

Mr. Nichols's lawyer conceded that to the extent that the State was offering the testimony of Mr. Booth, Mr. Fellman-Shimmin, and Ms. Pierce that his client had possessed two stolen firearms that night, "it's kind of difficult to argue that they can't reference him being in possession of it." RP at 128. But he continued:

But all this commentary about the—about the Feist murder, and all these other things, I don't think are particularly relevant.

*Id.*

The court denied the motion, explaining:

THE COURT: . . . [T]hat's how it appears to me, is more of . . . a res gestae thing. I mean, certainly the defense is able to cross examine each of these witnesses about, of course, their alleged involvement, or their bias, prejudice, ability to perceive, I mean, the kind of standard impeachment issues. And how do we un-ring that bell?

I don't know that it's possible to preclude the [S]tate from making any reference to that contact without—really limiting the [S]tate in presenting its case, such as it is.

So, I don't think I can—I can grant that motion in limine. I will listen closely to be sure that it kind of meets with this entire res gestae idea,

11

> but otherwise . . . I don't think the [S]tate can be precluded from . . . testimony that would implicate Mr. Nichols in what they're charging him with through these witnesses, who just happen to have been involved in this other activity.
>
> And maybe there's, you know, a limiting instruction of some sort. I don't think there is, but I think it has to be something that relies on cross examination perhaps to develop, as far as those witnesses and their credibility.
>
> So, I say no, I guess, because I see this as a res gestae issue.

RP at 131-32.

Mr. Nichols's brief in this court analyzes the trial court's denial of his 14th motion in limine as if it were a ruling on character evidence governed by ER 404(b). Thus analyzed, he argues that evidence of the Feist murder was improperly admitted because (1) it did not fall within the res gestae exception, (2) the trial court failed to conduct the required analysis on the record, and (3) the court failed to give a limiting instruction to minimize the damaging effect of such evidence. The State counters that the evidence about which Mr. Nichols complains on appeal was not character evidence and its admission was not governed by ER 404(b). We agree with the State.

Under ER 404(b), evidence of an individual's other crimes, wrongs, or acts is inadmissible to prove an individual's propensity to act in conformity therewith. Evidence of other bad acts may nevertheless be admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). Another proper purpose for admitting evidence of an individual's other crimes, wrongs, or acts, is as res gestae, to complete the story of the

12

crime on trial by proving its immediate context of happenings near in time and place.

*State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995) (quoting *State v. Tharp*, 27 Wn.

App. 198, 204, 616 P.2d 693 (1980), *aff'd*, 96 Wn.2d 591, 637 P.2d 961 (1981)).

In support of treating the trial court as faced with a character evidence issue, Mr.

Nichols points to the fact that his written motion, after itemizing his 14 concerns, stated

that "[a]s to the motions set forth in 8 through 14, said motions are based upon ER 401,

402, 403 *and 404.*" CP at 199 (emphasis added). He also relies on the fact that res gestae

was the focus of the trial court's reasoning and is recognized as a proper purpose for

which evidence of a criminal defendant's other crimes, wrongs, or acts can be offered

consistent with ER 404(b). But Mr. Nichols's generalized citation of 4 evidence rules in

support of 6 motions is not particularly enlightening. His trial lawyer never relied on

ER 404(b)—either by name or conceptually—when he orally argued his 14th motion in

limine. And the concept of res gestae has a long history that extends beyond its

application under ER 404(b).

The principal flaw in Mr. Nichols's ER 404(b)-based argument on appeal,

however, is that the trial evidence about which he is complaining is evidence of crimes,

wrongs, or acts by *others*, yet his concern is with the conclusion the jurors might have

drawn about *him.* He argues that admitting evidence of the Feist murder was highly

prejudicial, as he was "essentially convicted of the murder, a crime unrelated to him,

rather than the offenses with which he was charged." Br. of Appellant at 21. By its plain

13

terms, ER 404(b) simply does not apply. The trial court was not required to engage in ER 404(b) analysis. In substance, Mr. Nichols's objection to the evidence is one based on ER 401, 402, and 403: that evidence of the murder was either irrelevant, or, if relevant, that its probative value was substantially outweighed by the danger of unfair prejudice.

A party is entitled to admit relevant evidence except as limited by constitutional requirements or as otherwise provided by statute or the evidence rules. ER 402. A party may assign evidentiary error on appeal only on a specific ground made at trial, thereby having given the trial court the opportunity to prevent or cure any error. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007); ER 103(a)(1). The decision to admit evidence lies within the sound discretion of the trial court and should not be overturned on appeal absent a manifest abuse of discretion. *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983).

At the hearing on Mr. Nichols's motions in limine, the trial court, having Mr. Nichols's written motion before it, gave his lawyer, Mr. Maxey, an opportunity to clarify the concern addressed by his 14th motion:

> [THE COURT:] . . . I think that takes us up to number fourteen, which—by which the defense asks that the [S]tate make no reference to contact allegedly occurring between the defendant and certain of the [S]tate's intended witnesses.
> Now, what's your thinking here, Mr. Maxey?
> . . . .
> . . . What is the nature of the contact that is alleged to have occurred?

14

RP at 127. It was incumbent upon the defense to specify its objection in response to this request by the trial court. It was in responding to the court that Mr. Nichols's lawyer made his statement that "all this commentary about the—about the Feist murder, and all those other things, I don't think are particularly relevant." RP at 128.

Yet the State had a legitimate need to offer evidence of Mr. Nichols's possession of two of the stolen firearms on the night of the Feist murder. It had a legitimate interest in offering evidence of Mr. Nichols's concern over retrieving the stolen Derringer and his travel to the site of the utility vehicle accident, only to find that the sheriff's department was already there. The State reasonably anticipated that Mr. Nichols's lawyer would cross-examine Mr. Booth, Mr. Fellman-Shimmin, and Ms. Pierce about the plea deals under which they were testifying and it reasonably raised their murder convictions preemptively, in its direct examination of each of the three witnesses. Mr. Booth's identification and arrest for the murder of Mr. Feist is the most logical and natural way to explain the Stevens County sheriff department's discovery of evidence that Mr. Nichols participated in the Hannigan burglary. It would be impossible for the State to demonstrate to the jury that the presence of the Derringer at the utility vehicle accident site corroborated Mr. Booth's testimony against Mr. Nichols without presenting evidence that Mr. Booth was involved in the accident and lost the gun at that location.

15

The trial court reasonably concluded that excluding evidence of the murder would "really limit[] the [S]tate in presenting its case." RP at 131. The testimony of Mr. Booth, Mr. Fellman-Shimmin, and Ms. Pierce was not admitted for propensity reasons—Mr. Nichols can point to no evidence or argument from which a confused jury might have believed that he participated in the botched burglary and subsequent murder of Mr. Feist. Instead, the testimony of Mr. Booth, Mr. Fellman-Shimmin, and Ms. Pierce linked Mr. Nichols to the theft and possession of the firearms stolen from Mr. Hannigan and served to complete a coherent story. Mr. Nichols has failed to demonstrate that the trial court abused its discretion in denying the motion in limine.

Finally, and fastening on the trial court's comment that it might give a limiting instruction, Mr. Nichols argues that the trial court erred in failing to give one. He again assumes that ER 404(b) applies and relies on case law holding that when a trial court admits evidence under ER 404(b), a defendant is entitled to have a limiting instruction to minimize the prejudicial effect of such evidence. *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007). However, even where ER 404(b) applies—and here, it does not—"[t]he failure of a court to give a cautionary instruction is not error if no instruction was requested." *State v. Myers*, 133 Wn.2d 26, 36, 941 P.2d 1102 (1997). Mr. Nichols never requested a limiting instruction.

16

*II. Failure to consider an exceptional downward sentence*

Mr. Nichols's remaining assignment of error is that the trial court failed to consider his request for an exceptional downward sentence. He points to seemingly inconsistent statements made by the court during the sentencing hearing as to whether it enjoyed sentencing discretion.

A defendant generally cannot appeal a standard range sentence such as the sentence imposed on Mr. Nichols. RCW 9.94A.585(1); *State v. Williams*, 149 Wn.2d 143, 146, 65 P.3d 1214 (2003). He can appeal a failure by the sentencing court "to comply with procedural requirements of the [Sentencing Reform Act of 1981, chapter 9.94A RCW,] or constitutional requirements." *State v. Osman*, 157 Wn.2d 474, 481-82, 139 P.3d 334 (2006); RCW 9.94A.585(2). Where a defendant appeals a sentencing court's denial of his request for an exceptional sentence below the standard range, "review is limited to circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range." *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). "A court refuses to exercise its discretion if it refuses categorically to impose an exceptional sentence below the standard range under any circumstances; i.e., it takes the position that it will never impose a sentence below the standard range." *Id.* "The failure to consider an exceptional sentence is reversible error." *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005).

RCW 9.94A.589(1)(c) provides that where "an offender is convicted under RCW 9.41.040 for unlawful possession of a firearm . . . and for the felony crimes of theft of a firearm[,] . . .[t]he offender *shall serve consecutive sentences for each conviction . . . ,* and for each firearm unlawfully possessed." (Emphasis added.) RCW 9.41.040(6) similarly provides:

> Notwithstanding any other law, if the offender is convicted under this section for unlawful possession of a firearm . . . and for the felony crimes of theft of a firearm . . . then the offender *shall serve consecutive sentences* for each of the felony crimes of conviction listed in this subsection.

(Emphasis added.) These provisions reflect the policy of the HTACA, which was intended to "provide greatly increased penalties for gun predators and for those offenders committing crimes to acquire firearms." LAWS OF 1995, ch. 129, § 1(2)(c).

In *State v. Murphy*, 98 Wn. App. 42, 48-49, 988 P.2d 1018 (1999), the court held that "under the plain language of the HTACA, the trial court should have run each of [the defendant's multiple] firearm theft and unlawful possession convictions consecutively to one another." *See also State v. McReynolds*, 117 Wn. App. 309, 343, 71 P.3d 663 (2003) (holding that RCW 9.41.040(6) "clearly and unambiguously prohibits concurrent sentences for the listed firearms crimes").

In *In re Personal Restraint of Mulholland*, 161 Wn.2d 322, 166 P.3d 677 (2007), however, the Washington Supreme Court held that the same sentences that are mandated to run consecutively under subsection (1)(b) of RCW 9.94A.589 (serious violent offenses

18

that are not the same criminal conduct) may be ordered to run concurrently as an exceptional sentence "if [the sentencing court] finds there are mitigating factors justifying such a sentence." *Id.* at 327-28. RCW 9.94A.535, the exceptional sentence statute, provides that "[a] departure from the standards in RCW 9.94A.589 (1) and (2) governing whether sentences are to be served consecutively or concurrently is an exceptional sentence subject to the limitations in this section, and may be appealed by the offender or the state as set forth in RCW 9.94A.585 (2) through (6)."

The State in *Mulholland* argued that the exceptional sentence statute does not apply when the sentencing is under RCW 9.94A.589(1)(b), which requires that sentences for separate serious violent offenses to be served consecutively, but the Supreme Court disagreed. Because the statute "does not differentiate between subsections (1)(a) and (1)(b)," it ruled that the plain language of RCW 9.94A.535 "leads inescapably to a conclusion that exceptional sentences may be imposed *under either subsection of RCW 9.94A.589(1)*." 161 Wn.2d at 329-30 (emphasis added). It pointed to the fact that an exceptional sentence may be appealed by either the offender "or the State" under RCW 9.94A.535 as further support for its construction, since the State will be the aggrieved party when an exceptional sentence is imposed under RCW 9.94A.589(1) only when "concurrent sentences are imposed where consecutive sentences are presumptively called for." *Id.* at 330. For these reasons, it held that the sentencing court erred in sentencing

19

Mr. Mulholland under the "mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which he may have been eligible." *Id.* at 333.

In this case, consecutive sentencing was required under subsection (1)(c) of RCW 9.94A.589, dealing with firearm offenses, rather than under subsection (1)(b), which was at issue in *Mulholland.* But the language of RCW 9.94A.535 that "[a] departure from the standards in RCW 9.94A.589(1) . . . governing whether sentences are to be served consecutively or concurrently is an exceptional sentence subject to the limitations in this section" has equal application to sentences required by RCW 9.94A.589(1) to run consecutively, whether they are serious violent offenses or firearm offenses. The State does not argue otherwise on appeal. Its response to this assignment of error is not that the trial court *could not* run Mr. Nichols's sentences for firearm offenses concurrently as an exceptional sentence. Its response is that the trial court knew that it could, considered Mr. Nichols's request, and ultimately rejected it.

We turn, then, to the court's explanation of its sentencing decision but first provide the context in which it was delivered. Mr. Nichols filed a sentencing memorandum in which he pointed out that the court must first determine the standard sentencing range for his offenses, but "[b]ecause the standard sentencing range for Mr. Nichols' firearms convictions is clearly excessive in light of the purposes of the Sentencing Reform Act, Mr. Nichols[] is entitled to an exceptional sentence downward," citing RCW 9.94A.535(1)(g). CP at 313. Mr. Nichols devoted a section of his

20

memorandum to "Factors Justifying an Exceptional Sentence Downward," in which he pointed out that when imposing an exceptional sentence, "the Court has discretion to shorten sentences or impose concurrent sentences or a combination of both." CP at 314. Mr. Nichols's sentencing memorandum was filed several days before the July 31, 2012 sentencing hearing and it is clear from the court's comments during the sentencing hearing that it had read it.

At the sentencing hearing, the State presented its recommendation first. At the outset of addressing consecutive versus concurrent sentences for the firearm offenses, the State made it clear that it did not want the court to jump immediately to its discretion to impose an exceptional sentence. It wanted the court to first consider the presumptive sentences for the crimes and seriously consider the legislative intent. The following exchange occurred:

> [PROSECUTOR RADZIMSKI:] . . . [A]fter we get done talking about the offender score, which is nine-plus in this situation, we're left to—the big dispute that we have is what to do with the firearms charges.
> And going a little bit out of order, Mr. Maxey has two suggestions: One that the court can run the sentences concurrently with one another, that you can take 1 through 9 and 13 through 21, and disregard the RCWs, the two RCWs that state the court shall run these sentences consecutively. I don't know how we quite get there, but Mr. Maxey seems to think that the court has discretion. That simply does not fit with the statutes, nor does it fit with—
> THE COURT: *Does the court have authority pursuant to an exceptional sentence to run concurrent? I think that's probably what he was getting at.*
> MR. RADZIMSKI: I think—We can't—If the court phrases this as concurrent sentences for those offenses I think that's reversible error. *The only way that the court can get away with some kind of lesser sentence would be to impose an exceptional downward on those 18 offenses.*

21

I think other than that the court is obligated, given the holdings in *Murphy* and *McReynolds*—In *Murphy* what the court tried to do is they tried to run multiple gun charges, the unlawful possessions together then the theft of a firearm together and stack those. The Court of Appeals says you can't do that, the statute is clear, it's unequivocal, you have to run each one of these offenses **consecutive** to one another.

RP at 891-92 (emphasis added). The prosecutor returned later to why the court should give great weight to the legislative purpose behind the presumptively consecutive sentences before moving on to consider exceptional sentencing:

[MR. RADZIMSKI:] Judge, the biggest hurdle that I don't think the defense can overcome is the legislative purpose behind the statute. And it's not the Sentencing Reform Act that we're talking about; it's the Hard Time for Armed Criminals Act. And that statute has one purpose: to give out lengthy sentences for armed career criminals.

Look at Mr. Nichols' criminal history. That's what he is, Judge. He's got an extensive criminal history. He steals guns. Facts like these are why that law is on the books.

Now, the Hard Time for Armed Crime came into effect in 1995. That law, the Sentencing Reform Act, had been on the books since '84. So the legislature knew very well the types of sentences that could be passed and handed out by courts when they passed this law. And Judge, that—that law has been on the books since 1995 without any change. The legislature knows full well the types of sentences that this—this statute can—can dole out.

Now, your Honor, Mr. Maxey brings up that had this offense been committed in Idaho that Mr. Nichols would only be facing five or ten years. Well, Judge, Mr. Maxey also neglected to talk about Idaho's persistent violator statute, that says if you have three or more felony convictions your sentence range is five years to life imprisonment. So had this offense in fact been committed in Idaho Mr. Nichols would be looking at a life sentence, much like the one we're asking the court to impose.

Judge, even in Washington sentences like this are not uncommon. I recently got some feedback from prosecutor's [sic] across the state. Kittitas County gave out a 500-month sentence for this type of offense. Thurston County gave an individual 90 years for—weapons offenses, Judge. These are not unusual sentences.

22

RP at 896-97. The prosecutor told the court that he was not going to make a specific sentencing recommendation, because there was not much difference between the low end or top end standard range sentence. He concluded, "But I think a standard range sentence is appropriate. And I would ask that the court sentence Mr. Nichols somewhere within the standard range." RP at 898.

When it was Mr. Nichols's turn to respond, his lawyer stated, "We have suggested to the court to consider an exceptional sentence in this case for a number of reasons." RP at 900. He went on to talk about challenges in Mr. Nichols's background, the fact that Mr. Nichols's criminal history was entirely nonviolent crimes, and the lack of proportionality in imposing a life sentence on Mr. Nichols when Mr. Booth, Mr. Fellman-Shimmin, and Ms. Pierce were all serving less-than-27-year sentences. He argued

> there are a number of alternatives. We've asked that the court consider as
> an exceptional sentence running them concurrently. Or the court could give
> an exceptional sentence, depending on however the court fashioned to deem
> it, you know, giving a year on each offense, giving more on one, less on
> another; it's within the discretion of the court to give a sentence that we feel
> would be appropriate under the circumstances.

RP at 905.

Having reviewed the parties' briefing, heard their argument, and heard from the defendant, the court announced Mr. Nichols's sentence, explaining it at some length. We reproduce the portion of the court's explanation that Mr. Nichols relies upon in asserting error on appeal:

I am painfully aware that you are a human being and that you don't have a history of violence. And I can tell you that I had no idea at [the] time of trial that the—the ultimate sentencing range was anywhere near this. And like your attorney, I guess, I had that initial look and said, "This just can't be," that folks who are charged with and ultimately plead guilty to murder would end up with the sentences they did compared to the range that we look at here.

And your attorney reminds me of that, and he asks me to look at the purpose of the Sentencing Reform Act to determine whether the range here is clearly excessive. And there's a nonexclusive list of policy goals. He first talks about proportionality, seriousness of offense, and your—and your history.

And he mentions in his briefing, that "Well, there might not have been guns in this safe and had there not been guns it would have been a different story." And to that extent it's true. But as I think about that, you've been in prison, you have this criminal history. You are very well aware that anything having to do with guns is kryptonite; I mean, you're to keep away. And yet the safe was clearly a target. There was also jewelry and other items, and had it been just jewelry and other items we wouldn't be having this discussion today. But you targeted a safe with a pretty good idea, I think, that it might have weapons in it, weapons that could be fenced, sold, to generate money for other purposes.

And I thought about that. And that seemed to me to be precisely the reason why the legislature would pass 9.41.040(6), the—hard time for armed crime statute. But it's just that. It's the risk of firearms finding their way into a criminal population, into the hands of people [who] have demonstrated that they can't own or possess weapons responsibly.

So while we talk about seriousness of offense and criminal history, felons who are stealing and possessing guns, by legislative fiat, present an unacceptable risk of safety—risk to the public and public safety.

. . . .

[Defense counsel] then says, "Well, you know, what is essentially a life sentence or the possibility of life sentence doesn't provide respect for the law by providing a just punishment." *Yet in State v. Murphy, a case cited by the [S]tate, there's a quote: "It's the province of the legislature if it chooses, not the appellate court or a superior court, to ameliorate any undue harshness arising from"—from consecutive sentences for multiple firearm counts.*"

24

*The idea there is that it's—the way that the court promotes respect for the law is to abide by the law, and to enforce the law, not to make the law. And here, to a large degree, your attorney—who is ever—ever representing you zealously—suggests that I overlook the very clear language of two statutes in particular, 9.94A.589 and 9.41.040, which both make it mandatory that there be consecutive sentences. And I think Mr. Radzimski's right: were the court to impose anything other than consecutive sentences that it would be reversible error.*

. . . .

. . . And as someone who knows you can't be around weapons, you know, you opened the safe, you distributed the weapons, and ultimately one of the weapons that was involved in this—in this burglary, whether or not it was in the safe or not, resulted—or was used to commit a murder.

There has to be just punishment recognizing that's what happened, but I—I again look—look past that, I don't make too much of that, and rather just look at the offense here, where it's very clear that Mr. Booth didn't have the ability to plan or execute an offense like this, that you had spent, you know, nearly the last decade in jail or prison, you knew that you weren't supposed to have weapons, you targeted a gun safe. It's had [sic] to say that that—that didn't put you on notice that you knew there were going to be guns involved, and you knew that there were significant punishments for guns involved but you made that choice.

. . . .

*And it does seem harsh. I am the first to admit that.*

. . . .

And therefore, as we look to the—the counts, on Counts 1 through 9 of unlawful possession of a firearm in the first degree, with a standard range of 86 to 116 months, with nine counts, I'll sentence you to 90 months on each count, to run consecutive. That's 810 months.

On Counts 13 through 21 the standard range is 77 to 102 months. Nine counts, I'll sentence you to 80 months on each count to run consecutive. And that creates 1,530 months, 125 years or so.

And I recognize it's a life sentence. I—I have been painfully aware of that and thinking about it since I understood that this is what the range looked at—or, was—was calculated at.

*And again, I don't feel I have a choice.* And I think it's, in this case, also appropriate.

25

> With regard to the residential burglary, with your history of burglary I think it's appropriate to impose a sentence of 84 months to run concurrently with each of the other two sentence [sic].
>
> For theft of a motor vehicle, a mid-range sentence of 50 months, again to run concurrent with the other sentences.
>
> For trafficking in stolen property a sentence of 80 months, towards the top of the range, also to run concurrent. And that's based on this history of theft.
>
> *Again, I'm aware that there's no violent offenses in your history. And I'm aware that those who were convicted of the worst violent offense are looking at significantly less time than you. And I—I've thought about it. I don't like it.*
>
> *Nevertheless, this is my duty. It's my duty to uphold the law. And the legislature has determined that this is the appropriate—appropriate type of sentencing in cases like this, and it is therefore my—my obligation to follow the law as the legislature directs it.*
>
> So that will be the sentence of the court.

RP at 909-15 (emphasis added).

Viewed in isolation, the highlighted language might be viewed as suggesting that the trial court was mistaken about its discretion to impose concurrent sentencing through an exceptional downward sentence. But when the entire record is reviewed, it is clear that the option of an exceptional sentence had been briefed to the court, conceded by the State, and advocated for by Mr. Nichols. It is clear that it was understood and considered by the court.

Before imposing a sentence outside the standard range, the trial court must find "substantial and compelling reasons" justifying an exceptional sentence and that mitigating circumstances are established by a preponderance of the evidence. RCW 9.94A.535. When the court's statements are viewed in the context of the parties' briefing

26

and argument, it is clear that the trial court did not find mitigating circumstances or substantial and compelling reasons for an exceptional downward sentence as required by the statute. It accepted the State's analysis that however much it might *dislike* the sentence required by the presumptive sentencing statutes, if it could not find a basis for imposing an exceptional sentence, it was bound by the presumptive sentence established by the legislature. Thus understood, there was no error. A trial court has exercised its discretion if it "has considered the facts and has concluded that there is no basis for an exceptional sentence." *Garcia-Martinez*, 88 Wn. App. at 330.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Nichols states several. We address them in turn.

*Procedural Deficiencies.* Mr. Nichols makes two complaints about his opportunity to file the SAG. First, he claims that he had not received a transcript of the parties' opening statements at the time he completed his statement. Where provided at public expense, however, a verbatim report of proceedings will not include opening statements unless ordered by the trial court. RAP 9.2(b); RAP 9.2(e)(2)(D).

Second, Mr. Nichols asserts that he did not have priority access or adequate legal access for the first 10 days after receiving the notice of appeal. This issue involves factual allegations outside the record of this appeal. His remedy is to seek relief by a

personal restrain petition. *State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991); *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

*Prosecutorial Misconduct.* Mr. Nichols argues that the State committed prosecutorial misconduct by failing to proactively correct witness Crystal Fellman-Shimmin, Mr. Fellman-Shimmin's sister, when she falsely denied having been offered lenient treatment by the State in exchange for her testimony. Defense counsel had been notified by the prosecutor that Ms. Fellman-Shimmin had, in fact, reached an agreement with the State.

After the defense pointed out Ms. Fellman-Shimmin's perjurious denial to the court, the parties agreed to a procedure for correcting the record: the State would inform Detective Gilmore of the agreement reached with Ms. Fellman-Shimmin and to allow him to be questioned about it. The detective testified as follows:

Q    And are you aware, now, that there were negotiations between Ms. Crystal Fellman-Shimmin, her attorney and the prosecuting attorney's office resulting in an offer to her?
A    I'm aware of that now.
. . . .
Q    And as part of this arrangement with Crystal Fellman-Shimmin, isn't it true that in return for her agreement to testify in this case, that she would, once the case was done—that being this case—then she would go plea to tampering with physical evidence?
A    Yes, that's what the email says.
Q    Okay. And if you know, tampering with physical evidence is a gross misdemeanor?
A    Yeah.
Q    Okay. Is possession of stolen firearms a felony?
A    Correct.

RP at 743-44. Detective Gilmore's testimony was a solution agreed to by Mr. Nichols through his lawyer and was sufficient to inform the jury of Ms. Fellman-Shimmin's plea deal.

*Insufficient Evidence.* Mr. Nichols argues that the evidence was insufficient to support the jury's findings of guilt because Mr. Booth was asked twice to identify him in the courtroom and was unable to do so either time. "A defendant's challenge to the sufficiency of the evidence requires the reviewing court to view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt." *State v. Brown,* 162 Wn.2d 422, 428, 173 P.3d 245 (2007). Mr. Booth identified Mr. Nichols by name and other witnesses identified him in the courtroom. The identification was sufficient.

*Confrontation.* Mr. Nichols argues that his right to confrontation was violated when Detective Gilmore testified that a rail mounting piece for an assault rifle found during execution of the search warrant at Mr. Nichols's girl friend's residence was believed by the detective to have been stolen from Mr. Hannigan.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The primary right protected by the confrontation clause is the right to effective cross-examination of the adverse witness. The standard of review on a

29

confrontation clause challenge is de novo. *State v. Mason*, 160 Wn.2d 910, 922, 162 P.3d 396 (2007).

When the subject of the rail mounting piece was first raised during the detective's direct examination, he began to volunteer hearsay from Mr. Hannigan but was met with a prompt objection by defense counsel, which was sustained. In response to a reframed question, the detective testified only that he believed the rail mount was stolen from Mr. Hannigan, without offering hearsay or any other explanation. No objection was raised. Mr. Nichols fails to explain how the detective's testimony raises a Sixth Amendment issue. We will not consider the argument further. *See* RAP 10.10(c).

*Recorded Conversation.* Mr. Nichols claims that because the State did not establish that he and his girl friend were on notice that his phone calls from jail were being recorded, the introduction of the recording of their jailhouse call violated his right to due process and Washington State statute.

In laying a foundation for the recording, the State's witness, the chief corrections deputy for the Stevens County sheriff's office, testified that inmates are made aware that their calls will be recorded by signs posted throughout the facility. He testified that an automated recording at the outset of a call that the phone call is being recorded also puts both the inmate and the recipient of the call on notice that the call is being recorded. He admitted that once a recipient becomes aware of how the jail's call system works, he or she can press a button to "accept" a call immediately and thereby skip the notice that the

call is being recorded. RP at 709. The recording offered at trial did not include the automated notice of recording. It was the State's position that Mr. Nichols's girl friend accepted the call before the notice could be played.

Mr. Nichols's lawyer was allowed to voir dire the corrections deputy and, after doing so, objected there was insufficient evidence of notice required under a Washington statute (evidently referring to RCW 9.73.030 and .050) "that does not allow you to record people without their consent. And it says that if you do so it's not admissible for any purpose." RP at 715. The trial court overruled the objection.

Preliminary questions concerning the admissibility of evidence are determined by the court. ER 104(a). A court's rulings on the admission of evidence are reviewed for an abuse of discretion. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 264, 840 P.2d 860 (1992). Mr. Nichols fails to show an abuse of discretion in light of the testimony of the chief corrections deputy that procedures were in place to give both callers and recipients notice of the jail's practice of recording calls.

Were that not the case, we would find the admission of the recording harmless. The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole and did not affect the outcome of the trial. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). In assessing whether an error was harmless, we must measure the admissible

31

evidence of a defendant's guilt against the prejudice, if any, caused by the inadmissible testimony.

Here, the admissible evidence against Mr. Nichols included the testimony of the only witness to the burglary, Mr. Booth; his testimony and that of Mr. Fellman-Shimmin to the prying open of the safe; the testimony of those two and Ms. Pierce to Mr. Nichols's possession of the stolen guns; the evidence from Pawn 1 and Pacific Steel that Mr. Nichols had pawned or sold property stolen from the Hannigans; and evidence that stolen property bearing his fingerprint was found at his girl friend's home. The recording, by contrast, contained only statements from which inculpatory inferences might be drawn— evidence of minor significance that could not have affected the outcome of trial.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

32